4

[No. S048308. Oct. 3, 1996.]

DIXON ARNETT, as Executive Director, etc., Plaintiff and Respondent, v. WILLIAM J. DAL CIELO, as Chief Executive Officer, etc., Defendant and Appellant.

6

**COUNSEL**

Horvitz & Levy, David M. Axelrad, David S. Ettinger, Bjork, Lawrence, Poeschl & Kohn and Robert K. Lawrence for Defendant and Appellant.

David E. Willett, Catherine I. Hanson, Kimberly S. Davenport, Davis, Cowell & Bowe, Richard G. McCracken, Andrew J. Kahn, Musick, Peeler & Garrett and W. Clark Stanton as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Alvin Korobkin, Assistant Attorney General, Vivien Hara Hersh, Jane Zack Simon and Thomas P. Reilly, Deputy Attorneys General, for Plaintiff and Respondent.

Elisabeth C. Brandt, Taylor S. Carey, Sharon Mosley, David Link, J. Joseph Curan, Jr., C. Frederick Ryland, Cynthia G. Peltzman, Robert C. Fellmeth and Julianne B. D'Angelo as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Evidence Code section 1157 provides that the records of a hospital peer review committee are not "subject to discovery." We address

here the narrow issue whether an investigative subpoena issued by the Medical Board of California as part of its inquiry into the conduct of a physician with an apparent drug problem is "discovery" within the meaning of that statute. The trial court ruled that it is not and ordered compliance with the subpoena, and the Court of Appeal held to the same effect. We agree with those rulings, and therefore affirm the judgment of the Court of Appeal.

### The Medical Board of California

The state has long regulated the practice of medicine as an exercise of the police power. (See, e.g., Stats. 1876, ch. 518, p. 792 ["An Act to Regulate the Practice of Medicine in California"]; Stats. 1913, ch. 354, p. 722 [same]; Stats. 1937, ch. 399, p. 1254 [codifying Medical Practice Act as Bus. & Prof. Code, § 2000 et seq.].) A key instrument of that regulation has been the statewide agency authorized to license and discipline medical practitioners, successively known as the Board of Medical Examiners, the Board of Medical Quality Assurance, and now the Medical Board of California (hereafter the Board), a unit of the Department of Consumer Affairs (Bus. & Prof. Code, § 101, subd. (b)).

Since the earliest days of regulation the Board has been charged with the duty to protect the public against incompetent, impaired, or negligent physicians, and, to that end, has been vested with the power to revoke medical licenses on grounds of unprofessional conduct (e.g., Stats. 1876, ch. 518, § 10, p. 794). In recent years the Legislature has provided the Board with tools of increasing power and sophistication to assist it in that task. (See, e.g., Stats. 1990, ch. 1597, § 1, p. 7683; Stats. 1993, ch. 1267; Stats. 1995, ch. 708.) We deal here, however, with a tool that the Board has possessed at least since 1921: the investigative subpoena. (Stats. 1921, ch. 602, § 1, p. 1023 [adding former Pol. Code, § 353]; Stats. 1945, ch. 111, § 3, p. 439 [recodifying former Pol. Code, § 353, as Gov. Code, § 11181].) To appreciate the role of the Board's subpoena power it will be helpful to review briefly the authority and operation of the Board as a whole.

The Board currently consists of two divisions. (Bus. & Prof. Code, § 2003.) Its Division of Licensing is responsible for approving medical education programs, administering the licensing examination, and issuing licenses to practice. (Id., § 2005.) Its Division of Medical Quality, which we are concerned with here, is responsible for reviewing the quality of medical practice, conducting disciplinary proceedings in cases of unprofessional conduct, and generally enforcing the disciplinary and criminal provisions of the Medical Practice Act. (Id., § 2004.)

A primary power exercised by the Board in carrying out its enforcement responsibilities is the power to *investigate*: the statute broadly vests the

Board with the power of "Investigating complaints from the public, from other licensees, from health care facilities, or from a division of the board that a physician and surgeon may be guilty of unprofessional conduct." (Bus. & Prof. Code, § 2220, subd. (a).) The Board delegates its authority to conduct such an investigation to its executive director and its staff of professional investigators. (*Id.*, § 2224.) The Board's investigators have the status of peace officers (*id.*, § 160), and possess a wide range of investigative powers. In addition to interviewing and taking statements from witnesses, the Board's investigators are authorized to exercise delegated powers (Gov. Code, § 11182) to "Inspect books and records" and to "Issue subpoenas for the attendance of witnesses and the production of papers, books, accounts, documents and testimony in any inquiry [or] investigation . . . in any part of the state." (*Id.*, § 11181, subds. (a), (e).)

Because the statute authorizes the Board to issue a subpoena "in any inquiry [or] investigation" (Gov. Code, § 11181, subd. (e)), the Board may do so for purely investigative purposes; it is not necessary that a formal accusation be on file or a formal adjudicative hearing be pending. (*Brovelli v. Superior Court* (1961) 56 Cal.2d 524, 528 [15 Cal.Rptr. 630, 364 P.2d 462].) Indeed, such investigations often do not result in formal charges or hearings. (*Ibid.*) We further observed in the cited case that "As has been said by the United States Supreme Court, the power to make administrative inquiry is not derived from a judicial function but is more analogous to the power of a grand jury, which does not depend on a case or controversy to get evidence but can investigate 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' " (*Id.* at p. 529, quoting from *United States v. Morton Salt Co.* (1950) 338 U.S. 632, 642-643 [94 L.Ed. 401, 410-411, 70 S.Ct. 357].)

The Board's subpoena power, nevertheless, is judicially enforced: in the event that its subpoena is disobeyed, the Board may petition the superior court for an order compelling compliance. (Gov. Code, §§ 11186, 11187.) After a hearing, "If it appears to the court that the subpoena was regularly issued . . . , the court shall enter an order that the person appear before the officer named in the subpoena at the time and place fixed in the order and testify or produce the required papers. Upon failure to obey the order, the person shall be dealt with as for contempt of court." (*Id.*, § 11188.)

The Board is also authorized to order a licensee to personally submit to two types of examinations. First, after investigation by a medical expert the Board may order a licensee to take a professional competency examination if there is reasonable cause to believe that the licensee is "unable to practice medicine with reasonable skill and safety to patients." (Bus. & Prof. Code,

§ 2292, subd. (a).)[1] Second, the Board may order a licensee to undergo a physical or psychiatric examination if it appears the licensee is "unable to practice his or her profession safely because the licentiate's ability to practice is impaired due to mental illness, or physical illness affecting competency . . . ." (*Id.*, § 820.) Each of these examinations is an investigatory, not an accusatory, procedure. (*Smith* v. *Board of Medical Quality Assurance* (1988) 202 Cal.App.3d 316, 322-324 [248 Cal.Rptr. 704] [Bus. & Prof. Code, § 2292]; *Alexander D.* v. *State Bd. of Dental Examiners* (1991) 231 Cal.App.3d 92, 96-97 [282 Cal.Rptr. 201] [Bus. & Prof. Code, § 820].)

If, after such investigation as it deems necessary, the Board determines there is sufficient evidence of unprofessional conduct to warrant instituting a formal disciplinary action against a licensee, it refers the matter to the Attorney General; the action will then be prosecuted by the Senior Assistant Attorney General of the Health Quality Enforcement Section (see Gov. Code, § 12529) and the proceedings will be conducted in accordance with the Administrative Procedure Act (*id.*, § 11500 et seq.). (Bus. & Prof. Code, § 2230, subd. (a).) The Board may also petition for injunctive relief against any licensee whenever it has "reasonable cause to believe that allowing such person to continue to engage in the practice of medicine would endanger the public health, safety, or welfare" (*id.*, § 2313; see also Gov. Code, § 11529 ["interim order" suspending license, etc., on same ground].) If, after formal adjudicative proceedings, the licensee is found guilty of unprofessional conduct, the Board has a range of options: it may either suspend or revoke the license, or place the licensee on probation, or issue a public reprimand. (Bus. & Prof. Code, § 2227.) Finally, the Board's authority to order probation includes the authority to require the licensee to obtain additional professional training and pass an examination thereon, and to submit to a complete diagnostic examination, as well as the authority to restrict the extent or nature of the licensee's practice. (*Id.*, § 2228.)

It is apparent from the foregoing statutes that the purpose of the Board is to protect the health and safety of the public. This conclusion is confirmed by two additional provisions of the code. First, the Board shares the general purpose of public protection served by all agencies of the Department of Consumer Affairs. (Bus. & Prof. Code, § 101.6.) Second, the Legislature has recently specified that in exercising its disciplinary authority, "Protection of the public shall be the highest priority" of the Board (*id.*, § 2229, subd. (a)); and that although the Board must promote the goal of rehabilitating the

---

[1]"Reasonable cause" is defined as one or more of: "(1) a single incident of gross negligence; (2) a pattern of inappropriate prescribing; (3) an act of incompetence or negligence causing death or serious bodily injury; or (4) a pattern of substandard care." (Bus. & Prof. Code, § 2292, subd. (a).)

erring licensee whenever possible, "Where rehabilitation and protection are inconsistent, protection shall be paramount" (*id.*, subd. (c)).[2]

It is equally apparent that the "public" thus protected by the Board is the public at large, i.e., all consumers of medical services in California. This is because the Board is an agency of statewide jurisdiction: it licenses and disciplines all physicians and surgeons in California, not simply those practicing in a particular medical facility; and when it restricts, suspends, or revokes a license, it affects the licensee's right to practice throughout the state, not simply in a particular institution. We state these largely self-evident facts in order to contrast the Board with the entities we discuss next.

### Hospital Peer Review Committees

Every licensed hospital has a formally organized and self-governing *medical staff* responsible for "the adequacy and quality of the medical care rendered to patients in the hospital." (Cal. Code Regs., tit. 22, § 70703, subd. (a).) The medical staff is required to adopt rules for "appropriate practices and procedures to be observed in the various departments of the hospital" (*id.*, subd. (e)), and to keep minutes of its meetings and retain them in the hospital files (*id.*, subd. (c)). The medical staff acts primarily through a number of *peer review committees*. These committees evaluate physicians applying for staff privileges, establish standards and procedures for patient care, assess the performance of physicians currently on staff, and review such matters as the need for and results of each surgery performed in the hospital, the functioning of the patient records system, the control of in-hospital infections, and the use and handling of drugs within the hospital. (*Id.*, subds. (b) & (d); Comment, *Anatomy of the Conflict Between Hospital Medical Staff Peer Review Confidentiality and Medical Malpractice Plaintiff Recovery: A Case for Legislative Amendment* (1984) 24 Santa Clara L.Rev. 661, 668, fn. 36 (hereafter *Peer Review Confidentiality*).)

A peer review committee may informally investigate a complaint or an incident involving a staff physician. If the committee proposes to recommend that the privileges of the physician be restricted or revoked because of the manner in which he or she exercised those privileges, the physician is entitled to written notice of the charges and may request a formal hearing. (Bus. & Prof. Code, § 809.1.) If a hearing is requested, it must be conducted pursuant to strictly circumscribed procedures. (*Id.*, §§ 809.2-809.6.)

---

[2]We take no position on whether the quoted amendments to Business and Professions Code section 2229 in 1990 were a substantive change in the law or merely a clarification of existing law. (See *Borden* v. *Division of Medical Quality* (1994) 30 Cal.App.4th 874 [35 Cal.Rptr.2d 905].)

If a hospital restricts or revokes a physician's staff privileges as a result of a determination by a peer review body, the discipline must be reported to the Medical Board. (Bus. & Prof. Code, § 805.) The statute imposes this reporting requirement on all peer review bodies, which are defined to include the medical staff of any licensed health care facility and any representative medical society or committee that reviews the quality of professional care. (*Id.*, subd. (a)(1).) The chief of staff or administrator of any such peer review body must file a report with the Board whenever, as a result of that body's action and for a "medical disciplinary cause or reason,"[3] a licensee's application for staff privileges is denied, or staff privileges are revoked, or restrictions on staff privileges are imposed or voluntarily accepted, or a licensee resigns or takes a leave of absence. (*Id.*, subd. (b).) The report must name the licensee and provide "a description of the facts and circumstances of the medical disciplinary cause or reason" and any other relevant information. (*Ibid.*) The report must be filed within 15 days after the effective date of the discipline, and a supplemental report must be filed within 30 days after the licensee has satisfied any conditions of the discipline. Failure to file such a report, whether or not intentional, is punishable by a civil penalty of up to $5,000; an intentional failure to do so is a crime punishable by a fine of up to $10,000. (*Id.*, subds. (g) & (h).)[4]

In addition, if a proceeding initiated by a peer review committee against a staff physician results in disciplinary action required to be reported under the foregoing statute, the Board is entitled to inspect and copy the statement of charges, the exhibits introduced at the hearing, and the opinion, findings, or conclusions of the hearing officer. (Bus. & Prof. Code, § 805.1.)

Finally, it is unprofessional conduct for a physician to practice in any hospital with a staff of more than four physicians unless the hospital requires its medical staff members to conduct regular peer review of their clinical experience (Bus. & Prof. Code, § 2282, subd. (c)), and to ensure compliance

---

[3]A "medical disciplinary cause or reason" is defined as any aspect of a licensee's competence or professional conduct that is "reasonably likely to be detrimental to patient safety or to the delivery of patient care." (Bus. & Prof. Code, § 805, subd. (a)(6).)

[4]The Legislature imposes similar reporting requirements on other persons and agencies. (Bus. & Prof. Code, §§ 800-803.6.) For example, a judgment, settlement, or arbitration award against a licensee in a malpractice action must be reported to the Board by the appropriate court clerk, by the insurer or employer who pays it, or by the defendant licensee if uninsured. In such a case the Board has specific authority to "Investigat[e] the circumstances of practice" of the licensee in question. (*Id.*, § 2220, subd. (b).) Any felony indictment, information, or conviction of a licensee must be reported to the Board by the prosecuting agency, the court clerk, and the defendant licensee, and copies of any preliminary hearing transcript and probation report must be sent to the Board. Coroners must also report to the Board any pathologist's findings that a death may be the result of a licensee's gross negligence or incompetence.

the Board is authorized to inspect the "medical staff . . . records" of the institution (*id.*, § 2226).

It is apparent that these statutes implement the Legislature's finding and declaration that "Peer review, fairly conducted, will aid the appropriate state licensing boards in their responsibility to regulate and discipline errant healing arts practitioners." (Bus. & Prof. Code, § 809, subd. (a)(5).)

It is also apparent, however, that a hospital peer review committee differs from the Board in several ways. First, it is not a public agency created and funded by the state, but a group of private physicians selected by and from the staff of a hospital.[5] Second, the conduct of the errant physician is not reviewed by independent, professional investigators, but by the physician's own colleagues practicing in the same hospital: it is, by definition, a *peer* review committee. By weeding out incompetent or impaired staff physicians, therefore, the peer review process—in addition to its public protection function—inevitably also serves the private purpose of reducing the exposure of the hospital to potential tort liability. Third, the "public" protected by the peer review process is not the public at large, but is limited to the patients of the particular hospital in question. The process is institution specific: a physician stripped of staff privileges by one hospital is not ipso facto prevented from obtaining or maintaining such privileges at other hospitals—the only entity with the power to prevent that from happening is the Board.[6]

*Facts*[7]

In the spring of 1992 several nurses at Alameda Hospital (hereafter the Hospital) observed Dr. A., an anesthesiologist on the medical staff of the Hospital, behaving while on duty as if he were under the influence of narcotic drugs.

---

[5]It bears remembering that "So-called staff physicians should be distinguished from the resident physicians who are employed by the hospital. Staff physicians are private doctors granted medical staff privileges to treat their patients in the hospital setting." (*Peer Review Confidentiality*, *supra*, 24 Santa Clara L.Rev. 661, 664, fn. 14.)

[6]In an effort to reduce the likelihood of such "hospital shopping," the Legislature also provides that before granting or renewing staff privileges for any physician, a hospital must ask the Board if it has received a report of disciplinary action by any other hospital against that physician. (Bus. & Prof. Code, § 805.5, subd. (a).) The Board will furnish a copy of any such report unless the discipline was based solely on a failure to complete medical records, or the information reported is without merit, or the report is more than three years old. (*Id.*, subd. (b).)

[7]The following facts are taken from the principal pleading herein—the Board's petition for an order to compel compliance with its administrative subpoena, together with its declaration in support of that subpoena. No objection has been raised to the accuracy of the facts there alleged.

The first incident took place one evening in March 1992. Dr. A. was the anesthesiologist on call when a patient required emergency surgery. As Dr. A. was interviewing the patient, Nurse Larson observed that his speech was slurred. In discussing the case with him before surgery, she saw that his attention and comprehension were impaired. Dr. A. subsequently administered a general anesthetic to this patient. Following the surgery, Nurse Larson reported Dr. A.'s abnormal behavior to her supervisor.

The second incident occurred in late May 1992. A patient was awaiting scheduled surgery, but Dr. A. could not be found. After being paged several times he arrived and began interviewing the patient. Nurse Larson observed that his speech was even more slurred than during the first incident. She promptly called her supervisor and expressed her "grave concern" about Dr. A.'s condition. Thereafter the patient was taken into the operating room and Dr. A. administered sedation intravenously.

On another day that month Nurse McKenna was trying to take a patient into a bathroom but found the door locked. A visitor told her that someone had been in the bathroom for a long time. Nurse McKenna unlocked the door and found Dr. A. asleep in the room with his surgical pants down around his knees. He did not respond to his name, and Nurse McKenna had to shake him several times in order to rouse him. When he awoke, Dr. A. was disoriented and unsteady; in Nurse McKenna's opinion, he "did not behave like someone who had simply fallen asleep." She told Dr. A. that he was needed in surgery; he responded "OK," and went off to the operating room. Suspecting that Dr. A. was taking drugs, Nurse McKenna looked unsuccessfully for drug paraphernalia after he left. She then reported the incident to her supervisor. Later that day another nurse (Nurse McClure) told Nurse McKenna that Dr. A.'s behavior in the recovery room had been "strange" and he had had to lay his head on a desk.

Approximately six weeks thereafter, Nurse McKenna noticed that Dr. A.'s handwriting was shaky on several occasions, and again reported it. She also saw that Dr. A. had made an entry in a record—possibly a patient's chart—stating that he had broken an ampule of Fentanyl during a procedure.[8]

At some point during this period the Medical Executive Committee of the Hospital medical staff—a peer review committee—began to investigate the matter. Following the bathroom incident, the committee interviewed Nurse McKenna. Dr. A. thereafter appeared before the committee and admitted he

---

[8]Fentanyl, an opiate, is a Schedule II controlled substance. (Health & Saf. Code, § 11055, subd. (c)(8).)

had been injecting himself with Fentanyl, which he had taken from the Hospital's narcotics supplies. Dr. A. then requested a leave of absence for the months of October and November 1992 in order to enter an inpatient drug rehabilitation program at the New Bridge Foundation in Berkeley. The request was granted.

As noted above, the code requires that the peer review body report to the Medical Board any leave of absence taken by a staff physician after notice of an investigation into conduct reasonably likely to be detrimental to patient care or safety. (Bus. & Prof. Code, § 805, subd. (b).) The Hospital did not make such a report.

In January 1993 Dr. A. resumed his staff privileges, but under multiple restrictions imposed by the Hospital. These included random supervised urine testing as often as necessary to ensure that he remain drug free, peer review within 24 hours of every case performed, random concurrent review during procedures, daily review of all narcotics records including requirements that all breakages be co-signed and all drugs signed out be accounted for, weekly reports on his outpatient drug rehabilitation program including documentation of ongoing therapy, regular evaluation sessions with the principal medical staff members, and possible use of a narcotic antagonist.

At the same time, Dr. A. entered an outpatient drug rehabilitation program at the Merritt-Peralta Institute in Oakland, agreeing to further restrictions embodied in a "contract" he signed with the "monitoring and re-entry program" of that organization. At the outset of the document he acknowledged that "I am suffering from the disease of chemical dependency." The agreement obligated Dr. A., inter alia, to attend weekly progress and compliance meetings with the monitoring program, to attend 90 meetings of a 12-step program, a physician's support group, and a relapse group, to undergo weekly random body fluid analyses with notification of any positive results to the president of the Hospital's medical staff, to participate for 1 year in a narcotic antagonist program, and to obtain a work site monitor authorized to promptly report any suspected drug use or unusual behavior. The agreement was to run for 12 months, from January 7, 1993, to January 7, 1994, and could be extended for a second year.

As noted above, the code requires that the peer review body report to the Medical Board any restrictions, whether imposed or voluntarily accepted, on a staff physician's privileges, membership, or employment, for a total of 30 days or more in any 12-month period, because of any conduct reasonably likely to be detrimental to patient care or safety. (Bus. & Prof. Code, § 805, subd. (b)(3).) Again the Hospital did not make such a report. Indeed, both

the Hospital's restrictions on Dr. A.'s practice and the "contract" he signed could be read to imply that no report would be made to the Board as long as he did not violate their terms.[9]

The Board nevertheless learned of this case when a confidential informant reported to it that Dr. A. was a narcotic drug addict who had been under the influence of controlled substances while on duty at the Hospital. The Medical Practice Act contains numerous provisions under which such behavior could be found to be "unprofessional conduct" within the meaning of the act. For example, the following acts constitute unprofessional conduct: any violation of state or federal laws regulating controlled substances (Bus. & Prof. Code, § 2238), self-administration of a controlled substance (*id.*, § 2239), and practice while under the influence of any narcotic drug that impairs the ability to practice safely (*id.*, § 2280). Also relevant here are the general provisions declaring that it is unprofessional conduct to commit a violation of any provision of the Medical Practice Act, or gross negligence, or repeated acts of ordinary negligence, or any act that would have warranted denial of a license. (*Id.*, § 2234.)

The Board initiated the present investigation and assigned the case to Senior Investigator Shane P. Wright. On March 5, 1993, Investigator Wright interviewed the president of the Hospital medical staff and the medical staff coordinator. They informed her that when Dr. A. first applied for privileges some years earlier he admitted that during his residency he had had a "drug problem" but said he had recovered. In this interview Investigator Wright also learned the above recited facts that in 1992 two nurses had complained of Dr. A.'s unusual behavior, that Dr. A. subsequently admitted to injecting himself with Fentanyl, and that he had taken a leave of absence in October and November 1992 to participate in an inpatient drug rehabilitation program.

Investigator Wright thereafter learned the names of the two complaining nurses (Nurse Larson and Nurse McKenna) from a confidential informant, and interviewed them on April 1, 1993. They provided her with the descriptions of their observations of Dr. A.'s behavior that we have summarized above.

On April 2, 1993, Investigator Wright received a letter from the president of the medical staff and the chief executive officer of the Hospital outlining

---

[9]Item 8 of the Hospital's restrictions provided that the "first infraction" would be "reported to the Medical Board of California." Item 14 of the "contract" provided that the consequences of a relapse or noncompliance could include "notification to the Board of Medical Quality Assurance [i.e., the Medical Board]."

the above listed restrictions that the Hospital placed on Dr. A.'s practice when he returned from his leave of absence, and attaching a copy of Dr. A.'s above discussed "contract" with the drug rehabilitation program of the Merritt-Peralta Institute.

The Hospital also allowed Investigator Wright to interview its pharmacy and surgery personnel and to review its narcotic logs and the patient records in the cases under investigation. The Hospital refused, however, to allow Investigator Wright access to any records involving Dr. A. in the possession of either the Medical Executive Committee or the Credentials Committee.[10]

Investigator Wright's efforts to obtain information from other sources were also resisted. Thus Investigator Wright invited Dr. A. to an interview with the Board to discuss the incidents under investigation, but on March 17, 1993, Dr. A.'s counsel replied that his client declined the interview.

On March 26, 1993, Dr. A.'s counsel informed Investigator Wright that his client also refused to sign releases to allow the Board to obtain his treatment records from the New Bridge Foundation and the Merritt-Peralta Institute.

Investigator Wright subsequently asked Dr. A. to sign a waiver of a formal petition to compel him to submit to a physical and psychiatric examination (Bus. & Prof. Code, § 820), and to voluntarily agree to such an examination instead. On November 1, 1993, Dr. A.'s counsel informed Investigator Wright that his client refused to agree to the examination.

Investigator Wright then referred the case to Dr. William S. Brostoff, a specialist in addiction medicine, for an evaluation whether Dr. A. was able to practice with safety to the public. (See Bus. & Prof. Code, § 820.) On December 10, 1993, the Board received Dr. Brostoff's report, in which he stated that he could not determine whether Dr. A. posed a danger to the public because "I have not been able to review any medical or psychiatric records or evaluations of Dr. A., himself. Specifically, no medical or psychiatric records or evaluations of Dr. A. from his treatment programs are provided. Further, there are no medical or psychiatric updates since the signing of his monitoring and re-entry contract by Dr. A. on January 20, 1993. In addition, Dr. A., through his attorney, declined an invitation for an interview with the investigator. Consequently, I am unable to reach any conclusions about Dr. A.'s current medical or psychiatric state, the current status of his recovery from chemical dependency or the question of his being

---

[10]The Credentials Committee, another peer review committee, had reviewed Dr. A.'s application for staff privileges.

a potential danger to himself or others, or finally, whether or not he has impaired ability to conduct a solo practice with safety to the public." Dr. Brostoff recommended that Dr. A. take the above mentioned physical and psychiatric examination.

At this point Investigator Wright turned to the Board's subpoena power. On March 3, 1994, she served a subpoena duces tecum on the New Bridge Foundation and the Merritt-Peralta Institute for any records of Dr. A.'s treatment at those facilities after January 1, 1992. The Merritt-Peralta Institute replied that it could not locate such records, and the New Bridge Foundation refused to comply with the subpoena on the ground that disclosure was prohibited by a federal regulation.

Unable to obtain the information she sought either from the Hospital, from Dr. A., or from his treatment providers, Investigator Wright served a subpoena duces tecum on William J. Dal Cielo, chief executor officer of the Hospital, on April 11, 1994. The subpoena sought, inter alia, information provided by Dr. A. in his application for staff privileges that related to his prior history of drug abuse; copies of complaints received by the Hospital from staff or patients regarding Dr. A. after January 1, 1992; records of the meetings of the Medical Executive Committee concerning Dr. A.'s drug use; documentation of Dr. A.'s leave of absence, of the terms of the Hospital's restrictions on his practice, and of his monitoring and re-entry agreement; and copies of the periodic reports required under those terms and that agreement concerning such matters as Dr. A.'s body fluid testing, compliance with the rehabilitation programs, and response to treatment.

The Hospital refused to comply with the subpoena. On April 29, 1994, the Board, acting through Dixon Arnett, its executive director, filed the present petition for an order to enforce the subpoena. (Gov. Code, § 11187.) The Hospital opposed the petition on the grounds that the documents sought by the subpoena were immune from discovery under Evidence Code section 1157 and that the Board failed to show "good cause" for its issuance (see, e.g., *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1145-1150 [212 Cal.Rptr. 811]). After hearing, the court granted the petition and ordered the Hospital to comply with the subpoena.

The Hospital appealed from the order. In its briefs before the Court of Appeal, the Hospital abandoned its claim of lack of good cause and asserted only its contention that the records sought by the Board were immune from discovery under Evidence Code section 1157. While the appeal was pending, the Board petitioned the superior court for an order compelling the New Bridge Foundation and the Merritt-Peralta Institute to comply with the

subpoenas it had served on them for Dr. A.'s treatment records. The court again granted its petition to compel. The New Bridge Foundation, the Merritt-Peralta Institute, and Dr. A. separately challenged this order by petitions for extraordinary relief, and the Court of Appeal granted alternative writs. The Court of Appeal thereafter addressed these petitions and the Hospital's appeal in a single opinion.

First, the Court of Appeal held that the "better view" is that an order compelling compliance with an administrative subpoena is appealable as a final order in a special proceeding, following *Millan* v. *Restaurant Enterprises Group, Inc.* (1993) 14 Cal.App.4th 477, 484-485 [18 Cal.Rptr.2d 198], and cases cited. The parties do not question that holding here, and it is therefore not before us for review.

Next, the Court of Appeal addressed the writ petitions by the New Bridge Foundation and the Merritt-Peralta Institute, and held that records of drug abuse treatment such as Dr. A. received from those organizations are made confidential by a federal statute and its implementing regulations and by section 11977 of the Health and Safety Code. Accordingly, the Court of Appeal issued a peremptory writ of mandate directing the superior court to vacate its order granting the Board's motion to enforce its subpoenas against the New Bridge Foundation and the Merritt-Peralta Institute. The Board did not seek review of this holding, and it is therefore not before us.

Turning to the Hospital's appeal, the Court of Appeal held that in enacting Evidence Code section 1157 the Legislature did not intend to immunize peer review records from investigative subpoenas by administrative agencies. Accordingly, the Court of Appeal affirmed the order granting the Board's petition to enforce its subpoena for such records. We granted the Hospital's petition for review, and now affirm the judgment of the Court of Appeal.

I

Insofar as relevant here, subdivision (a) of Evidence Code section 1157 (hereafter section 1157) provides that "Neither the proceedings nor the records of organized committees of medical . . . staffs in hospitals, or of a peer review body . . . having the responsibility of evaluation and improvement of the quality of care rendered in the hospital, . . . shall be *subject to discovery*." (Italics added.) There is no question that the Board seeks to obtain hospital peer review committee records within the meaning of section 1157. The sole issue is whether the Board's investigative subpoena is "discovery" within the meaning of this statute.

The Hospital contends that as used in section 1157 the word "discovery" includes subpoenas issued by administrative agencies for investigative purposes. The Board contends, rather, that in section 1157 "discovery" means

only the formal exchange of evidentiary information between parties to a pending adversary proceeding. The Court of Appeal correctly recognized that "as commonly used in its legal sense, the term is limited as the Board suggests." But the Court of Appeal then reasoned that the Hospital's construction of the term is at least "reasonable," and invoked the rule that when the wording of a statute is "susceptible of more than one reasonable interpretation," the courts resolve the conflict by giving weight to a variety of extrinsic aids such as legislative history, the purpose to be served, and public policy. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

In our view, the rule of construction relied on by the Court of Appeal is not here applicable. ■ It is true that courts ordinarily give the words of a statute the usual, everyday meaning they have in lay speech. (*Alexander* v. *Superior Court* (1993) 5 Cal.4th 1218, 1225 [23 Cal.Rptr.2d 397, 859 P.2d 96].) But that rule has an important exception, and it governs this case: when a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute. This has long been the law of California: "The rule of construction of statutes is plain. Where they make use of words and phrases of a well-known and definite sense in the law, they are to be received and expounded in the same sense in the statute." (*Harris* v. *Reynolds* (1859) 13 Cal. 514, 518.)

This rule has been declared in our basic codes since they were first enacted in 1872. (Civ. Code, § 13 [words and phrases are to be construed according to "approved usage," but "such others as may have acquired a peculiar and appropriate meaning in law . . . are to be construed according to such peculiar and appropriate meaning"]; accord, Code Civ. Proc., § 16; Pen. Code, § 7, subd. 16; see Prob. Code, § 21122.) The United States Supreme Court follows this rule. (E.g., *Bradley* v. *United States* (1973) 410 U.S. 605, 609 [35 L.Ed.2d 528, 532, 93 S.Ct. 1151] ["Rather than using terms in their everyday sense, '[t]he law uses familiar legal expressions in their familiar legal sense.' "]; *Standard Oil Co.* v. *United States* (1911) 221 U.S. 1, 59 [55 L.Ed. 619, 644-645, 31 S.Ct. 502], and cases cited.) And it is the general rule in our sister states. (See 2A Sutherland, Statutory Construction (5th ed., 1992 rev.) § 47.30, p. 262.)

The rule applies most obviously when the meaning of the word in question is wholly or primarily legal. (E.g., *Estate of Ross* (1903) 140 Cal. 282, 290 [73 P. 976] ["devise" and "legacy"]; *Bruner* v. *Superior Court* (1891) 92 Cal. 239, 245 [28 P. 341] ["elisor"]; *Texas Commerce Bank* v. *Garamendi* (1992) 11 Cal.App.4th 460, 475 [14 Cal.Rptr.2d 854] ["annuities"]; *Taylor* v. *Forte Hotels International* (1991) 235 Cal.App.3d 1119, 1123-1124 [1 Cal.Rptr.2d

189] ["conversion" and "recovery"]; *Plotitsa* v. *Superior Court* (1983) 140 Cal.App.3d 755, 762 [189 Cal.Rptr. 769] ["special and general damages"]; *Handlery* v. *Franchise Tax Board* (1972) 26 Cal.App.3d 970, 981 [103 Cal.Rptr. 465] ["unitary business"].) But the rule is also applicable when the word has both a specific legal meaning and a more general sense in informal legal usage or in lay speech. (E.g., *People* v. *Murray* (1994) 23 Cal.App.4th 1783, 1789 [29 Cal.Rptr.2d 42] ["imprisonment"]; *In re Jodi B.* (1991) 227 Cal.App.3d 1322, 1328 [278 Cal.Rptr. 242] ["parent"]; *Poe* v. *Diamond* (1987) 191 Cal.App.3d 1394, 1398-1399 [237 Cal.Rptr. 80] ["party"]; *People* v. *Heitz* (1983) 145 Cal.App.3d Supp. 8, 17 [193 Cal.Rptr. 138] ["construction" and "improvements"].) In that event the lawmakers are presumed to have used the word in its specifically legal sense.

This is such a case. It is true, as the Hospital contends, that from time to time courts and commentators speak of an administrative agency as using its investigative subpoena power to "discover" evidence for the purpose of deciding whether to charge a statutory violation. (E.g., *Okla. Press Pub. Co.* v. *Walling* (1946) 327 U.S. 186, 201 [90 L.Ed. 614, 625, 66 S.Ct. 494, 166 A.L.R. 531] [the purpose of an investigative subpoena of the Wage and Hour Administrator is "to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so."].) To speak in those terms, however, is simply to use the word "discover" in its general sense of finding something out by search or observation, as when we say that a detective "discovered" incriminating evidence at the scene of a murder.

As the Board contends and the Court of Appeal agreed, "discovery" also has a specific legal meaning, to wit, the formal exchange of evidentiary information and materials between parties to a pending action. The two meanings of the word are well recognized in the dictionaries. Thus a leading legal dictionary first defines "discovery" to mean, *"In a general sense*, the ascertainment of that which was previously unknown; the disclosure or coming to light of what was previously hidden," and gives as example, "the granting of a new trial for newly 'discovered' evidence." (Black's Law Dict. (6th ed. 1990) p. 466, italics added.) But the same work also defines the word in its specifically legal sense, as "The pre-trial devices that can be used by one party to obtain facts and information about the case from the other party in order to assist the party's preparation for trial," and gives as examples such formal procedures as depositions, interrogatories, requests for admission, and motions for production of documents. (*Ibid.*) Even nonlegal dictionaries draw this distinction, defining "discovery" as "1. The act or an instance of discovering. 2. Something that has been discovered. 3. *Law.* Data or documents that a party to a legal action is compelled to disclose to another

party either prior to or during a proceeding." (Am. Heritage Dict. (2d college ed. 1985) p. 403.)

The Legislature has long been aware of the specific legal meaning of the term "discovery." (E.g., Stats. 1851, ch. 5, § 417, p. 117 [referring to "discovery" by means of depositions of parties].) Almost four decades ago the Legislature enacted the landmark Civil Discovery Act of 1957 (Stats. 1957, ch. 1904, § 3, p. 3322), largely based on the discovery provisions of the Federal Rules of Civil Procedure. (See *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 375-376 [15 Cal.Rptr. 90, 364 P.2d 266].) In turn, the provisions of the 1957 act were substantially rewritten and expanded in the Civil Discovery Act of 1986 (Stats. 1986, ch. 1334, § 2, p. 4700), which is currently in effect. Throughout this act, codified in sections 2016 to 2036 of the Code of Civil Procedure, the Legislature repeatedly and consistently uses the term "discovery" only in the foregoing legal sense of the procedures by which *parties* to a *pending action* exchange *evidence* admissible in that action. For example, in defining the scope of discovery under the act the Legislature specifies that "any *party* may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved *in the pending action* or to the determination of any motion made in that action, if the matter either is itself *admissible in evidence* or appears reasonably calculated to lead the discovery of admissible evidence." (*Id.*, § 2017, subd. (a), italics added.)

The Legislature exhibited a similarly consistent understanding of the term "discovery" when in 1968 it enacted a special statutory scheme (Stats. 1968, ch. 808, § 3, p. 1561) "provid[ing] the exclusive right to and method of discovery" in proceedings under the Administrative Procedure Act (Gov. Code, § 11507.5), including therefore proceedings brought by the Board to discipline a physician charged with unprofessional conduct. There, too, discovery is defined as the right of "a party" to obtain evidentiary information "upon written request made to another party," but only "After initiation of a proceeding in which [the person charged] is entitled to a hearing on the merits" (*id.*, § 11507.6), i.e., after the process has passed from the investigatory stage to the filing of a formal accusation (*id.*, §§ 11503-11506).

The Legislature is also well aware of the distinction between discovery and the exercise of the subpoena power; when it wishes to protect a class of evidence from *both* procedures, it knows how to do so. As noted above, the Board is authorized to order a licensed physician to undergo a physical or psychiatric examination if it appears the licensee's ability to practice is impaired by mental or physical illness. (Bus. & Prof. Code, § 820.) Section 828 of the same code provides in relevant part that "If the licensing agency

determines, pursuant to proceedings conducted under Section 820, that there is insufficient evidence to bring an action against the licentiate . . . , then all licensing agency records of the proceedings, including the order for the examination, investigative reports, if any, and the report of the physicians and surgeons or psychologists, shall be kept confidential and are not subject to *discovery or subpoena*." (Italics added.) If "discovery" included "subpoena," the latter word would be surplusage. ■ Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage. (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798-799 [268 Cal.Rptr. 753, 789 P.2d 934], and cases cited.)

■ The emphasized choice of words, moreover, is deliberate: the Legislature uses the same wording in at least 13 other provisions of the code. For example, if the Board finds insufficient cause to file an accusation against a physician based on the results of a professional competency examination (Bus. & Prof. Code, § 2292), all records of the examination "shall be kept confidential and shall not be subject to *discovery or subpoena*." (*Id.*, § 2294, subd. (b), italics added; see also *id.*, § 3756, subd. (e) [respiratory care practitioner].)

Again, the Board is authorized to operate a "diversion program" for the treatment and rehabilitation of physicians whose competency is impaired by drug or alcohol abuse. (Bus. & Prof. Code, § 2340.) The code declares that all records pertaining to the treatment of a physician in that program "shall be kept confidential and are not subject to *discovery or subpoena*." (*Id.*, § 2355, subd. (b), italics added.) The Legislature has made essentially identical provisions for eight other classes of licensees,[11] and has likewise provided that all records of drug and alcohol treatment and rehabilitation of licensees furnished by providers under contract with any regulatory board in the Department of Consumer Affairs "shall be kept confidential and are not subject to *discovery or subpoena*." (*Id.*, § 156.1, subd. (b), italics added; see also *id.*, § 4982.2, subd. (g) [records of physical and mental condition of family counselor petitioning for reinstatement after suspension or revocation of license].)

Finally, the Board calls our attention to two recent federal decisions that draw the distinction between discovery and subpoena in different but nevertheless illustrative contexts. *Linde Thomson Langworthy Kohn & Van Dyke* v. *RTC* (D.C. Cir. 1993) 5 F.3d 1508, dealt with the Resolution Trust Corporation (RTC), an agency that Congress created to act as the receiver for

---

[11](Bus. & Prof. Code, §§ 1698, subd. (b) [dentist], 2369, subd. (b) [osteopath], 2497.1, subd. (g) [podiatrist], 2667 [physical therapist], 2770.12 [registered nurse], 3534.7 [physician assistant], 4436 [pharmacist], 4871, subd. (b) [veterinarian].)

failed savings and loan institutions and vested with the power to issue investigative subpoenas. In the cited case the RTC began an investigation of a failed Missouri thrift by issuing a subpoena duces tecum to a law firm connected with the thrift. The firm refused to comply with certain portions of the subpoena. On the RTC's petition, the district court ordered compliance. While the firm's appeal was pending, the RTC filed suit against it in federal district court alleging violations of Missouri law.

The Court of Appeals for the District of Columbia Circuit affirmed. Relevant here is the firm's contention that the Missouri law of attorney-client privilege applied and barred the subpoena because the subsequently filed suit would turn on rules of state law. The contention was based on the premise that an administrative investigation is merely an opening stage of subsequent litigation and is the equivalent of a civil discovery procedure. The federal circuit court rejected this premise, observing that "An investigation conducted by the RTC may conceivably neither culminate in litigation, nor be initially designed to inspire it." (5 F.3d at p. 1512.) And such an investigation is not the equivalent of discovery; rather, "Unlike a discovery procedure, an administrative investigation is a proceeding distinct from any litigation that may eventually flow from it." (*Id.* at p. 1513.)

*E.E.O.C.* v. *Deer Valley Unified School Dist.* (9th Cir. 1992) 968 F.2d 904, dealt with the federal Equal Employment Opportunity Commission (EEOC), an agency that is likewise empowered by Congress to issue investigative subpoenas. In the cited case the EEOC began an investigation into the hiring policies and practices of an Arizona school district, issuing an administrative subpoena duces tecum for certain documents. When the school district failed to produce all the documents, the EEOC petitioned the district court for an order of compliance. The district court denied relief because the EEOC had not followed a local rule that required parties to meet and confer before filing a "discovery" motion. The district court found "no reason to treat a subpoena enforcement action such as this, which is in essence pre-litigation discovery, any differently from a more typical discovery request." (*Id.* at p. 906.) Although the school district ultimately complied with the subpoena, the district court awarded attorney fees against the EEOC because of its violation of the local rule.

The Court of Appeals for the Ninth Circuit reversed the award, holding that the EEOC's petition to enforce its subpoena was not a "discovery" motion. The court reasoned that "The investigatory subpoena power of the EEOC is based on specific statutory authority, not on the general discovery provisions of the Federal Rules of Civil Procedure." (968 F.2d at p. 906.) In language that echoes our reasoning in the case at bar, the court explained

that "The function of administrative investigatory subpoenas differs from that of the discovery provisions of the Federal Rules of Civil Procedure. The discovery provisions apply to actions that have already been filed with the court, and the parties are seeking to develop evidence for the action that is before the court. The statutory subpoena authority, on other hand, is designed for administrative investigations, which may or may not result in any further action before the district court." (*Ibid.*, fn. omitted.)

For all these reasons, the term "discovery" in section 1157 is to be given its well-established legal meaning of a formal exchange of evidentiary information between parties to a pending action, and that meaning does not include a subpoena issued, as here, by an administrative agency for purely investigative purposes.

## II

The Hospital raises a number of contentions to the contrary, but none is persuasive.

The Hospital begins by arguing that to construe "discovery" to include an administrative investigative subpoena, as it urges, would serve the purpose or policy that the Legislature sought to promote in enacting section 1157. The Hospital then devotes considerable effort to establishing that the purpose or policy underlying section 1157 is to encourage members of hospital review committees to engage in candid and uninhibited evaluations of the competence of their peers. (See *Alexander* v. *Superior Court, supra,* 5 Cal.4th 1218, 1226-1227, and *West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 852-854 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257], both quoting from *Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623, 628-629 [115 Cal.Rptr. 317].) The contention puts the cart before the horse. ▮ In determining legislative intent, courts look first to the words of the statute itself: if those words have a well-established meaning, as we hold they do here, there is no need for construction and courts should not indulge in it. (*People* v. *Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163]; *DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140]; *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) The Hospital's argument that a different or broader meaning would also serve the purpose or policy underlying section 1157 is an argument that should be made to the Legislature, not to the courts.

The Hospital next asserts that a "broad construction" of the term "discovery" would be "consistent with prior interpretations of the statute," again

citing *Alexander* v. *Superior Court, supra,* 5 Cal.4th 1218. But in *Alexander* and similar decisions the courts were called upon to construe provisions of section 1157—or to answer questions relating to the coverage of the statute itself—that in the circumstances were susceptible of more than one reasonable interpretation. For the reasons stated above, that is not the case here.

The Hospital also notes that in certain other states, statutes similar to section 1157 provide that peer review committee records shall not be subject to discovery "in any civil action." (See *Com'r of Health Services* v. *Kadish* (1989) 17 Conn.App. 577 [554 A.2d 1097, 1099]; *Mercy Hosp.* v. *Dept. of Professional Reg.* (Fla.Dist.Ct.App. 1985) 467 So.2d 1058, 1059-1060; *Unnamed Physician* v. *Com'n on Medical Dis.* (1979) 285 Md. 1 [400 A.2d 396, 399-402].) From the fact that in this state section 1157 *does not* include the quoted words, the Hospital infers that the Legislature *does* intend the term "discovery" in our statute to be broadly construed to extend beyond "civil actions" to include administrative investigative subpoenas. The inference is strained. Although the presence of the quoted words in section 1157 would have facilitated our task—in the three cited cases the courts had no difficulty in holding, as we do here, that peer review committee records are not immune from an administrative investigative subpoena—their absence does not compel a contrary conclusion: as explained above, our statute uses the term "discovery" in its well-established legal sense and that sense does not include such subpoenas.

The Hospital also relies on the fact that another provision of the Evidence Code (§ 1156, subd. (a)) provides that hospital staff committee records of studies designed to reduce morbidity or mortality are "subject to Sections 2016 to 2036, inclusive, of the Code of Civil Procedure," i.e., the Civil Discovery Act. Again, such a citation in section 1157 would have been helpful but its absence does not change the plain meaning of the statute. Indeed, the lack of significance of this very wording is demonstrated by a pair of closely related provisions of the Evidence Code. Section 1156.1, subdivision (a), provides that the records of a certain type of quality assurance committee relating to studies designed to reduce morbidity or mortality are "subject to Sections 2016 to 2036, inclusive, of the Code of Civil Procedure . . . ." The Hospital stresses the fact that the statute expressly cites the Civil Discovery Act rather than saying simply that the records are "subject to discovery." But section 1157.6 of the same code, which addresses essentially the same topic, *does* say simply that such records are "subject to discovery," and the Legislature enacted the two statutes in successive sections of the same bill (Stats. 1982, ch. 234, §§ 4, 5, p. 767). Thus at least in this portion of the Evidence Code—which includes section 1157, the statute at issue here—the Legislature refers interchangeably to "discovery" and to the Civil Discovery Act.

The Hospital contends that our reading of section 1157 leads to " 'absurd consequences' " (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1166 [278 Cal.Rptr. 614, 805 P.2d 873]) because *after* the Board files an accusation, it is assertedly prohibited from discovering the same records that our reading allows it to discover *before* filing an accusation. The Hospital finds this prohibition in a clause of the Government Code statute that provides generally for discovery under the Administrative Procedure Act after a formal accusation is filed. (Gov. Code, § 11507.6.) That statute lists several categories of discoverable documents, and then declares by way of limitation that "Nothing in this section shall authorize the inspection or copying of any writing or thing which is privileged from disclosure by law or otherwise made confidential or protected as the attorney's work product." (*Ibid.*) In reply, the Board argues that the Legislature did not intend the quoted clause of Government Code section 11507.6 to incorporate the bar of Evidence Code section 1157 against discovery of peer review committee records. Whether the cited Government Code provision bars the Board from discovering peer review committee records after the filing of a formal accusatory proceeding against a physician under the Administrative Procedure Act is not an issue in this case, however, and we decline to decide it. We therefore also decline to speculate that the "absurd consequence" envisioned by the Hospital would in fact flow from our reading of section 1157.

The Hospital next asserts that our reading of section 1157 makes superfluous a statute that we discussed above, Business and Professions Code section 805.1. As we explained, a hospital peer review committee may conduct formal disciplinary proceedings against a staff physician pursuant to a special statutory procedure. (*Id.*, § 809.2 et seq.) If after such proceedings the hospital imposes formal discipline on the physician that it is required to report to the Board pursuant to section 805, section 805.1 entitles the Board to "inspect and copy" the principal documents generated by the hearing, to wit, the statement of charges, exhibits introduced at the hearing, and the opinion, findings, or conclusions of the hearing officer. (*Id.*, subd. (a).) The Hospital claims there is "no purpose" to the latter statute if the Board already has the general power to obtain peer review committee records by means of an administrative investigative subpoena.

The point is unpersuasive. Prior to the enactment of Business and Professions Code section 805.1 in 1986, if a hospital refused to release peer review records that the Board needed to inspect, the Board was required to issue a subpoena under Government Code section 11181 and, if necessary, to file a proceeding in superior court under Government Code section 11187 to enforce that subpoena. In section 805.1 the Legislature sought to provide the Board with a simpler option in a limited class of cases and for a limited

category of records, by giving the Board automatic access to the principal documents generated in any formal disciplinary proceedings conducted by the Hospital. Yet by providing the Board with this limited *additional* investigative tool, the Legislature cannot have intended to strip it ipso facto of its broad *preexisting* power under the Government Code to issue subpoenas to investigate all cases of unprofessional conduct, whether or not they resulted in formal disciplinary proceedings by the hospital. The Hospital's argument reads too much into the modest aim of section 805.1.

Section 1157 contains several express exceptions to its prohibition against the discovery of peer review committee records.[12] The Hospital next contends that our reading of section 1157 adds a new exception to the statute— for administrative investigative subpoenas—and therefore violates the rule of construction that " 'where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed.' " (*Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 410 [267 Cal.Rptr. 589, 787 P.2d 996], quoting from *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].)

That rule of construction, however, applies only when a court proposes to create an "exception" to a "rule," and a true "exception" is a case that would otherwise be included within the rule. That is not the case here. For the reasons stated above, the "rule" of section 1157 is that peer review committee records are immune from "discovery" in the sense of a formal exchange of evidentiary information between parties to a pending action; because an administrative investigative subpoena is not "discovery" in that sense, it would not be within the scope of section 1157 in any event, and our holding excluding it does not create an "exception" to the statute.

The Hospital invokes one last rule of statutory construction. On March 4, 1993, a lengthy and complex bill was introduced in the Legislature (Sen. Bill No. 916) that proposed a large number of changes in the several statutes governing the discipline of health care professionals.[13] The bill was amended no less than nine times during its passage through the Legislature in the

---

[12]The principal exceptions are: "The prohibition relating to discovery . . . does not apply to the statements made by any person in attendance at a meeting of any of those committees who is a party to an action or proceeding the subject matter of which was reviewed at that meeting, or to any person requesting hospital staff privileges, or in any action against an insurance carrier alleging bad faith by the carrier in refusing to accept a settlement offer within the policy limits." (§ 1157, subd. (c); see also *id.*, subds. (d), (e).)

[13]The bill was 47 pages in length and contained 35 sections, many of which made multiple changes in the relevant statutes.

ensuing six months, and many sections were added, omitted, or rewritten.[14] It was finally passed and signed into law in September 1993. (Stats. 1993, ch. 1267.) One of the provisions of the original bill that was omitted in the midst of this process—in the fourth of its nine amendments, on June 3, 1993—would have added a clause to section 1157 reciting that "Nothing in this section shall be construed to prevent the discovery of evidence relevant to a disciplinary proceeding or investigation against a licensee by the applicable licensing board." From the fact that the quoted clause was *not* adopted, the Hospital infers that the Legislature intends the opposite, i.e., that section 1157 *shall* be construed to prevent "the discovery of evidence relevant to . . . [an] investigation" of a licensee by the Board. In support, the Hospital invokes a rule of construction, found in several Court of Appeal decisions, to the effect that " ' "The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision." ' " (*Crespin* v. *Kizer* (1990) 226 Cal.App.3d 498, 514 [276 Cal.Rptr. 571].)

In reply, the Board relies on a distinction drawn by another Court of Appeal between a failure to enact a proposed provision of a *new* statute and a failure to enact a proposed amendment to an *existing* statute, concluding that "there is relatively little value in examining an existing statute in light of proposed amendments which have not been approved." (*Save-on Drugs, Inc.* v. *County of Orange* (1987) 190 Cal.App.3d 1611, 1623 [236 Cal.Rptr. 100].)

Although the distinction would be sufficient to defeat the Hospital's contention in this case because section 1157 had been in existence for 25 years when Senate Bill No. 916 proposed to amend it, we question the soundness of the Hospital's rule of construction itself. In most cases there are a number of possible reasons why the Legislature might have failed to enact a proposed provision. One reason might have been, of course, that the Legislature rejected the proposal on its merits. But the Legislature might equally well have been motivated instead by considerations unrelated to the merits, not the least of which is that it might have believed the provision unnecessary because the law already so provided: in the case at bar, for example, the Legislature could well have believed that section 1157 did not need amending because its prohibition against "discovery" did not include administrative investigative subpoenas in any event. Indeed, when as here a provision is dropped from a bill during the enactment process, the cause may not even be a *legislative* decision at all; it may simply be that its proponents decided to withdraw the provision on tactical grounds.

---

[14]By the time of its final version the bill had grown to 60 pages in length and contained 62 sections.

Because these reasons apply equally to a failure to enact a new statute and to a failure to amend an existing statute, we decline to draw any such distinction: both cases are governed by our often stated rule that "Unpassed bills, as evidences of legislative intent, have little value." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323]; accord, *Santa Clara County Local Transportation Authority* v. *Guardino* (1995) 11 Cal.4th 220, 238 [45 Cal.Rptr.2d 207, 902 P.2d 225]; *Granberry* v. *Islay Investments* (1995) 9 Cal.4th 738, 746 [38 Cal.Rptr.2d 650, 889 P.2d 970].) Under that rule, the inference that the Hospital seeks to draw from the legislative history of Senate Bill No. 916 is unpersuasive.

Finally, the Hospital contends that to immunize peer review committee records from administrative investigative subpoenas "would do little, if any, harm to the Board's disciplinary function" because the Board can assertedly obtain much of the same information from other sources. Like the Hospital's first contention, this is an argument that should be made to the Legislature, not to the courts.[15]

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

---

[15]Shortly before oral argument the Hospital filed two requests asking us to take judicial notice of (1) an order of the Board dated September 15, 1995, directing Dr. A. to submit to a psychiatric examination pursuant to Business and Professions Code section 820, and (2) a report dated June 10, 1996, on the outcome of that examination by the psychiatrist who conducted it. Both events occurred long after the trial court entered its judgment on May 15, 1994, and the Hospital took this appeal. We are therefore governed by the general rule that an appellate court will consider only matters that were part of the record at the time the judgment was entered. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764].) No exception to that rule is here applicable. For this reason the requests for judicial notice are denied.