OFFICE OF the CHIEF MEDICAL EXAMINER, Plaintiff Below–Appellant,

v.

DOVER BEHAVIORAL HEALTH SYSTEM, Defendant Below–Appellee.

No. 483, 2008.

Supreme Court of Delaware.

Submitted: March 25, 2009.

Decided: June 30, 2009.

A. Ann Woolfolk, Esquire, (argued) of the Department of Justice, Wilmington, DE, for appellant.

Norman H. Brooks, Jr., Esquire, (argued) of Marks, O'Neill, O'Brien & Courtney, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, JACOBS and RIDGELY, Justices.

RIDGELY, Justice:

Plaintiff–Appellant, the Office of the Chief Medical Examiner ("OCME"), appeals from the Superior Court's denial of its motion to compel Defendant–Appellee Dover Behavioral Health System ("DBHS") to comply with an administrative subpoena for records and documents pertaining to the death of Joseph Heverin. The Superior Court held that the requested documents were protected by the peer review privilege. OCME raises three arguments on appeal. First, it contends that the court erred by holding that the peer review privilege codified in 24 *Del. C.* § 1768 limited OCME's subpoena authority under 29 *Del. C.* § 4709. Alternatively, OCME contends that the peer review privilege does not apply to the two records it seeks: (1) an investigative report that DBHS was required to, and did, provide to the Office of Health Facilities Licensing and Certification ("OHFLC"); and (2) an incident report given to the peer review committee. We find no merit to OCME's arguments and affirm.

## I. Facts and Procedural History

While in the care and custody of DBHS, Joseph Heverin died on February 25, 2008. Heverin choked on food while eating lunch in the DBHS cafeteria and was transported to Kent General Hospital, where he was pronounced dead by the attending physi-

cian. Judith Tobin, M.D., an assistant medical examiner ("AME"), performed an autopsy and issued a certificate of death the following day.[1]

OCME began an investigation pursuant to 29 *Del. C.* § 4706, which requires OCME to investigate the cause and manner of death of any person who dies when unattended by a physician or in any suspicious or unusual manner.[2] On February 26, 2008, as part of its investigation, OCME requested from DBHS a copy of the incident report detailing the circumstances surrounding Heverin's death. DBHS denied the request. The next day, Dr. Tobin issued an administrative subpoena pursuant to 29 *Del. C.* § 4709, which commanded DBHS to produce "all medical records and internal documents pertaining to Joseph Heverin." The same day, DBHS produced Heverin's medical records, but did not include two reports that it created as a result of the incident. Nor did DBHS include any internal documents arising from those reports which, DBHS maintained, were privileged.

DBHS did produce a privilege log to OCME on the withheld reports. Upon review of the log, OCME determined that it needed only two items from the list to complete its investigation. Item one was a report prepared for OHFLC, which, like OCME, is a state agency within the Department of Health and Social Services (the "OHFLC Report"). Item two was a report prepared at the time of Heverin's

death by a mental health technician employed by DBHS.[3] That report was prepared at the direction of DBHS's Director of Risk Management for DBHS's peer review committee (the "Healthcare Peer Review Report").

After the assertion of privilege by DBHS, OCME filed in the Superior Court a motion to compel production of the OHFLC Report and the Healthcare Peer Review Report. In response, DBHS claimed that the documents sought under the subpoena were protected by the peer review privilege and not subject to disclosure. The Superior Court denied OCME's motion after a hearing, finding that "the reports sought fall squarely within the statutory peer review privilege."[4] This appeal followed.

## II. Discussion

OCME contends that the peer review privilege created by 24 *Del. C.* § 1768 does not limit the power of OCME pursuant to 29 *Del. C.* §§ 4706 and 4709 to obtain the investigative report provided to OHFLC and the incident report given to the DBHS peer review committee. This issue focuses solely on the Superior Court's interpretation of Section 1768, which is a legal issue we review *de novo*.[5] Not at issue is the authority of OCME to investigate Heverin's death by interviewing witnesses with knowledge of the circumstances or the cause of Heverin's death.[6]

---

1. Heverin suffered from Huntington's Chorea, which causes difficulty swallowing. The death certificate listed this, along with "aspiration of food," as leading to the cause of death: asphyxia.

2. 29 *Del. C.* § 4706(a), (c).

3. The technician was not a member of the peer review committee.

4. *Office of the Chief Med. Exam'r v. Dover Behavioral Health Sys.,* Del.Super., No. 08M–

05–025, at 4 (Aug. 25, 2008) [hereinafter *Superior Court Opinion*].

5. *See Ford Motor Co. v. Dir. of Revenue,* 963 A.2d 115, 118 (Del.2008); *Pavulak v. State,* 880 A.2d 1044, 1045 (Del.2005); *Alfieri v. Martelli,* 647 A.2d 52, 53 (Del.1994).

6. At oral argument, counsel for OCME and DBHS agreed that OCME could subpoena witnesses—including the authors of the reports in question—and take their statements concerning the facts of the incident.

### A. OCME has broad power to investigate certain deaths.

OCME is responsible for investigating the essential facts concerning the medical causes of death in a variety of situations, including when a person dies as a result of violence, by suicide, when unattended by a physician, or "in any suspicious or unusual manner...." [7] In the course of such an investigation, the Chief Medical Examiner, the Assistant Medical Examiners, and the Deputy Medical Examiners "may administer oaths and affirmations and take affidavits and make examinations" as to any matter within the jurisdiction of their offices. They also have the power to issue subpoenas.[8] If OCME determines the cause of death within a reasonable medical certainty, it must prepare and file a written report "within thirty days after an investigation of such death." [9]

The authority of OCME to investigate is broad. As the Superior Court recognized, "OCME seems to have carte blanche to label and investigate almost any death...." [10] Here, OCME's motion to compel states the reason for the investigation of Heverin's death as a death "unattended by a physician." During the hearing, however, OCME argued that Heverin's death could also be viewed as "suspicious" or "unusual." DBHS does not contest these points. Accordingly, it is undisputed that OCME has the authority to investigate Heverin's death.

### B. The scope of the peer review privilege.

In an effort to encourage the medical peer review process, the General Assembly has provided immunity to the members of certain boards of review. This immunity is conferred upon all medical personnel who participate in "peer review committees or organizations whose function is the review of medical records, medical care, and physicians' work, with a view to the quality of care and utilization of ... facilities." [11] Such persons "are immune from claim, suit, liability, damages, or any other recourse, civil or criminal, arising from any act, omission, proceeding, decision, or determination undertaken or performed, or from any recommendation made, so long as the person acted in good faith and without gross or wanton negligence in carrying out the responsibilities, authority, duties, powers, and privileges of the offices conferred by law upon them...." [12]

Along with this immunity, the General Assembly has created a privilege for the records and proceedings of peer review committee meetings. Section 1768(b) of Title 29 provides:

> Unless otherwise provided by this chapter, the records and proceedings of committees and organization described in subsection (a) of this section are confidential and may be used by those committees or organizations and the members thereof only in the exercise of the proper functions of the committee or organization. The records and proceedings are not public records and are not available for court subpoena, nor are they subject to discovery. A person in attendance at a meeting of any such committee or organization is not required to testify as to what transpired at the meeting.... [13]

7.   29 *Del. C.* § 4706(a), (c).

8.   29 *Del. C.* § 4709.

9.   29 *Del. C.* § 4707(a).

10.   *Superior Court Opinion, supra* note 4, at 3.

11.   24 *Del. C.* § 1768(a).

12.   *Id.*

13.   24 *Del. C.* § 1768(b).

■ Delaware courts have recognized that the public policy behind the peer review privilege is to foster open and critical inspection of health care facilities procedures. The privilege was enacted as part of a comprehensive revision of the laws which govern the practice of medicine to "provide for the establishment and enforcement of professional standards in the practice of medicine, and in furtherance thereof provides confidential protection for the records and proceedings of committees charged with professional standards, review and enforcement for those performing those functions." [14] It is in the public interest to ensure that health care providers' critical analyses are not chilled by the fear of litigation over the analysis itself.[15]

■ In *Connolly v. Labowitz*,[16] the Superior Court explained that "[r]ecords include any paperwork, reports or compilation of date which are used *exclusively* by the committee. Documents used exclusively by a peer review committee . . . are privileged, and not discoverable." [17] But, the court also noted that the privilege is waived as to documents published to nonmembers.[18] This proposition—that documents are only privileged insofar as they are used exclusively by the committee—

has remained constant, even though the Superior Court has revisited the privilege over the last twenty-five years.[19] We agree with this analysis, because Section 1768 expressly applies only to actual committee members. Accordingly, we adopt the Superior Court's interpretation and expressly limit the privilege to paperwork, reports, or compilation of data that are used *exclusively* by peer review committees.

## C. The OHFLC Report is covered by the peer review privilege.

■ OCME contends that Superior Court erred when it determined that the OHFLC Report was privileged under Section 1768. OCME argues that the report was created at the direction of and provided to OHFLC, a state agency that surveys hospitals. As a result, OCME argues, the report was not prepared for the exclusive use of the peer review committee, and thus, was not privileged.

DBHS responds that in order to show waiver, the discoverer must show that the records were "used by or published to persons outside the specific review organization." [20] The privilege may be waived if the record is "shown to or used by some-

**14.** *Hagadorn v. Davidson*, 1990 WL 18274, at *2 (Del.Super.Ct. Feb. 12, 1990); *see also Danklef v. Wilmington Med. Center*, 429 A.2d 509, 513 (Del.Super.Ct.1981); *accord* Delaware Medical Practices Act, 60 Del. Laws ch. 462.

**15.** *See Hagadorn*, 1990 WL 18274, at *2; *Dworkin v. St. Francis Hosp., Inc.*, 517 A.2d 302, 307 (Del.Super.Ct.1986).

**16.** 1984 WL 14132, at *1 (Del.Super.Ct. Dec. 17, 1984). In the absence of a decision by this Court, *Connolly* has become the definitive Delaware case on the peer review privilege. *See, e.g., Cain v. Villare*, 2005 WL 2710854, at *1 (Del.Super.Ct. Oct. 19, 2005) ("*Connolly* . . . is instructive on the scope of the peer review statute."); *McBroom v. Graybeal*, 2000

WL 1211142, at *1 (Del.Super.Ct. Mar. 31, 2000); *Riggs Nat'l Bank v. Boyd*, 2000 WL 303308, at *6 (Del.Super.Ct. Feb. 23, 2000); *Dworkin*, 517 A.2d at 307 (relying on guidelines laid out in *Connolly*).

**17.** *Connolly*, 1984 WL 14132, at *1.

**18.** *Id.; see also Hagadorn*, 1990 WL 18274, at *2; *cf.* DEL. R. EVID. 510 (stating that a privilege is waived if the holder "voluntarily discloses or consents to disclosure of any significant part of the privileged matter.").

**19.** *See, e.g., Cain*, 2005 WL 2710854, at *2; *McBroom*, 2000 WL 1211142, at *1; *Dworkin*, 517 A.2d at 307.

**20.** *Connolly*, 1984 WL 14132, at *1.

one who is not a participant in the peer review process."[21] DBHS argues that OHFLC is itself a peer review organization. Section 1768 defines those who are considered to be a peer review organization—and thus participants in the peer review process—as those whose "function is the review of medical records, medical care and physicians work, with a view to the quality of care and utilization of hospital ... facilities."[22] We agree that OHFLC is a peer review organization.

OHFLC is a state agency that, pursuant to federal law, manages complaints and incidents at federally-certified Medicare agencies.[23] It investigates complaints and incidents at such facilities to determine "if a problem exists that could have a negative impact on the healthcare services provided [and] prevent the escalation of these problems into a more serious situation that would threaten the health, safety and welfare of the individual receiving service."[24] OHFLC prioritizes complaints, and may order an "off-site" investigation conducted by the agency if it determines an "on-site" investigation by the OHFLC is not warranted.[25] If an agency fails to comply with an OHFLC-ordered investigation, it can lose its Medicare certification.[26] DBHS is a federally-certified Medicare agency. The OHFLC Report at issue here is an "off-site" investigation into Heverin's death ordered by OHFLC.

Because OHFLC's "function is the review of medical records, medical care, and physicians' work, with a view to quality of care and utilization of hospital ... facilities[,]" we agree with the Superior Court's conclusion that OHFLC is one of the "peer review committees or organizations" contemplated by Section 1768(a). Since OHFLC is a "participant in the peer review process," DBHS's disclosure of the report to that agency did not waive the privilege provided by Section 1768.

D.  *The Healthcare Peer Review Report is covered by the peer review privilege.*

OCME contends that Superior Court erred in determining that the Healthcare Peer Review Report was privileged under Section 1768. The Healthcare Peer Review Report was created by the mental health technician who escorted Heverin to the cafeteria on February 25, 2008. It was prepared at the direction of DBHS's Director of Risk Management exclusively for the peer review committee's use. OCME argues that no privilege applies, because the Healthcare Peer Review Report was merely furnished to the peer review committee. It contends that Section 1768 does not treat records *furnished to* and records *generated by* the peer review committee equally. This argument is without merit.

OCME relies upon the following emphasized phrases in Section 1768(b):

Unless otherwise provided by this chapter, *the records and proceedings of committees and organization described in subsection (a) of this section are confidential* and may be used by those committees or organizations and the members thereof only in the exercise of the proper functions of the committee or organization. *The records and proceedings are not public records and are not*

---

21.  *Hagadorn*, 1990 WL 18274, at *2.

22.  24 *Del. C.* § 1768(a)

23.  42 U.S.C. § 1395aa; 42 C.F.R. §§ 488.7, .10.

24.  42 C.F.R. § 488.7, .10; State Operations Manual § 5000.2, *available at* http://cms.hhs.gov/manuals/downlods/som107c05.pdf.

25.  State Operations Manual § 5000.2.

26.  42 C.F.R. §§ 488.7, .10.

*available for court subpoena, nor are they subject to discovery.* A person in attendance at a meeting of any such committee or organization is not required to testify as to what transpired at the meeting. *A person certified to practice medicine, or a hospital, organization, or institution furnishing,* in good faith and without gross or wanton negligence, information, data, reports, or *records to such a committee* or organization or a member thereof with respect to any patient examined or treated by a person certified to practice medicine or examined, treated, or confined in the hospital or institution *is not, by reasons of furnishing such information data, reports, or records, liable in damages to any person or subject to any other recourse, civil or criminal. . . .* [27]

OCME contends that the statute protects "the records and proceedings of committees," and treats them differently from "information, data, reports, or records [furnished] to such a committee." OCME asserts that, although the records of the committee are not public and are not subject to subpoena or discovery, the information "furnished to" the committee is not expressly privileged, even though certain persons who supply that information may be immune from liability.

■ OCME reads into Section 1768 a distinction that is not there. A more natural interpretation of the statute is to read the phrase "the records and proceedings of committees" as encompassing information, data, reports, and records that are *both* furnished to *and* generated by the peer

review committee. This interpretation is supported by the structure of the statute. Subsection (a) addresses protection for committee members, while subsection (b) addresses protection for committee information. The thrust of subsection (b) is to protect the records and proceedings of the committee from discovery, but that protection encompasses corollary protections. Examples include protecting attendees from testifying as to what transpired at the meeting (including what evidence was introduced), establishing civil and criminal immunity for those furnishing information to the committee, and identifying certain instances when disclosure of such privileged information is permitted.

■ Moreover, given the Superior Court's consistent interpretation of Section 1768, the General Assembly's actions indicate that it intended to treat records furnished to and generated by the peer review committee the same way. After the Superior Court decisions adopting this interpretation, the General Assembly re-enacted Section 1768 without significant alterations to the statutory language relied on by the Superior Court in *Riggs National Bank v. Boyd* and *McBroom v. Graybeal.* [28] Therefore, we can presume that the General Assembly was aware of these interpretations and adopted them when it re-enacted the statute. [29]

### E. *OCME's investigative power does not trump the statutory peer review privilege.*

■ OCME contends that Superior Court erred in determining that the peer

---

27. 24 *Del. C.* § 1768(b).

28. *See McBroom,* 2000 WL 1211142, at *1; *Riggs Nat'l Bank,* 1998 WL 283384, at *1.

29. It is a cardinal principal of statutory construction that the legislature is "presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that

interpretation when it re-enacts a statute without change." *Allen v. Prime Computer, Inc.,* 540 A.2d 417, 420 (Del.1988) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)).

review privilege defeats the power of OCME to receive copies of all of the records of DBHS pertinent to its investigation into Heverin's death. OCME argues that the language of Section 1768 unambiguously applies only where the records of a peer review committee are sought in connection with a public documents request or court subpoena or court-related discovery. In this case, OCME asserts, none of those conditions are present because OCME is seeking production of the documents through an administrative subpoena.

OCME contends that, although Delaware law is silent on the issue, courts of other jurisdictions have addressed whether there is a distinction between the use of privileged documents in civil litigation and the production of the same documents in response to an administrative subpoena. Specifically, OCME points to *Arnett v. Dal Cielo*,[30] a California Supreme Court decision, which states that "the term 'discovery' ... is to be given its well-established legal meaning of a formal exchange of evidentiary information between parties to a pending action, and that meaning does not include a subpoena issued, as here, by an administrative agency for purely investigative purposes."

OCME's reliance upon *Arnett* is misplaced, because the California and Delaware statutes are different. Unlike the Delaware statute, the California statute only extends the peer review privilege to "discovery."[31] *Arnett* rested on the premise that where the legislature uses a term with an established legal meaning, it intended that legal meaning. The court found that the legislature knew the meaning of the terms discovery and subpoena and knew how to exempt a class of evidence from both procedures.[32] But, Delaware's peer review privilege statute is far more expansive than California's and indicates an intent to preserve the peer review privilege in most cases.

OCME also points to *Pennsylvania Protection & Advocacy, Inc. v. Houstoun*,[33] where the United States Court of Appeals for the Third Circuit determined that an agency could obtain peer review-protected materials.[34] That court's decision, however, was based on its finding that the agency was a rights protection agency as defined under federal law, that a federal statute required that such agencies be given access to a defined category of records, and that the federal statute preempted "any state law that gives a healthcare facility the right to withhold such records."[35] The court also noted that there was no conflict with the state law protecting certain peer review records because the Pennsylvania statute provided only that "[t]he proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence *in any civil*

---

**30.** 14 Cal.4th 4, 56 Cal.Rptr.2d 706, 923 P.2d 1, 13 (1996).

**31.** *Compare* 24 *Del. C.* § 1768 *with* Cal. Evid. Code § 1157(a) ("Neither the proceedings nor the records of organized committees of medical ... staffs in hospitals, or of a peer review body ... having the responsibility of evaluation and improvement of the quality of care rendered in the hospital, ... shall be *subject to discovery*.").

**32.** *Arnett*, 56 Cal.Rptr.2d 706, 923 P.2d at 11–13.

**33.** 228 F.3d 423, 425–26 (3rd Cir.2000).

**34.** *See* Protection and Advocacy for Mentally Ill Individuals Act (PAMII), Pub. L. No. 99–319, 100 Stat. 478 (codified at 42 U.S.C. §§ 10801–10905).

**35.** *Houstoun*, 228 F.3d at 428.

*action....*"[36] The court explained that, because the agency was acting as an advocate and in an investigative role, it did not seek to "discover" the materials or introduce them into evidence in the course of civil litigation.[37]

Even if the Third Circuit's decision had rested solely on its construction of Pennsylvania's peer review privilege statute, *Houstoun* is inapposite because the Pennsylvania and Delaware statutes are different.[38] Unlike the Pennsylvania statute, Section 1768 has no limiting "civil action" language. While Section 1768(b) provides that the records and proceedings of a peer review committee are not "subject to discovery," it also provides more generally that they may be used "only in the exercise of the proper functions of the committee or organization."[39] Moreover, also unlike the Pennsylvania statute, Section 1768 contains a provision expressly allowing federally-qualified rights protection agencies access to otherwise privileged peer review documents.[40]

The language and purpose of Section 1768 demonstrate that the legislature intended the peer review privilege to prevail over an OCME subpoena for the reports at issue here. First, as noted above and as both parties conceded, the purpose of Section 1768 is to prevent the chilling effect caused by disclosing information used by medical review committees in accomplishing their tasks. Of the two interpretations advanced in this appeal, only DBHS's theory satisfies that purpose.

■ Second, although OCME relies upon the phrase "court subpoena" in Section 1768(b) as exempting by implication an administrative subpoena from the statute's umbrella of protection, an exception should not be implied where the General Assembly has expressly provided for exceptions in the statute.[41] The final sentence of Section 1768(b) contains an exception which states: "This section may not be construed to create a privilege or right to refuse to honor a subpoena issued by or on behalf of the Board of Medical Practice pursuant to § 1731A(d) of this title...."[42] 24 *Del. C.* § 1731A(d) empowers the Executive Director of the Board of Medical Practice, in certain situations, to "by subpoena, compel the production of a list of the medical records reviewed during the peer review process, a list of the quality assurance indicators, and/or a list of other issues which were the basis for the peer review, quality assurance, or similar process."[43] This express exception for the Board demonstrates that the General As-

---

36. 63 Pa. Stat. 425.4.

37. *Houstoun,* 228 F.3d at 428.

38. *Compare* 24 *Del. C.* § 1768 *with* 63 Pa. Stat. 425.4.

39. *See* 24 *Del. C.* § 1768.

40. *See* 24 *Del. C.* § 1768 ("This section may not be construed to create a privilege or right to refuse to honor a subpoena issued by or on behalf of the Board of Medical Practice pursuant to § 1731A(d) of this title, *nor may it be construed to limit access to records by rights-protection agencies whose access is authorized by federal law.*")

41. *See State v. Fletcher,* 974 A.2d 188, 2009 WL 1524937, at *3–5 (Del. May 27, 2009) (finding that only the General Assembly was empowered to expand the list of offenses that it had expressly declared cannot be expunged and declining to "do by judicial implication what the General Assembly itself has declined to do by express legislation.").

42. 24 *Del. C.* § 1768(b).

43. 24 *Del. C.* § 1731A(d). "The Board of Medical Practice has the sole authority in this State to issue certificates to practice medicine and is the State's supervisory, regulatory, and disciplinary body for the practice of medicine." 24 *Del. C.* § 1710(a).

sembly knew how to carve out an exception for OCME if it chose to do so, and indicates that the General Assembly intended the protections of Section 1768 to encompass administrative subpoenas.

We emphasize that the peer review privilege does not prevent OCME from performing its statutorily-mandated duty to investigate Heverin's death. OCME may question any person with knowledge of the circumstances or cause of Heverin's death. Pursuant to its broad investigative authority, OCME also may subpoena witnesses, administer oaths and affirmations, and take affidavits from witnesses as to the facts surrounding Heverin's death. However, records and proceedings of the peer review committee, including the actual reports and testimony provided to and used exclusively by the committee, are privileged under Section 1768.

### III. Conclusion

The judgment of the Superior Court is **AFFIRMED.**