# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

DEBORAH PALMER, Individually,              )
and as Representative of the Estate         )
of VANCE PALMER,                            )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )   C.A. No. N19C-01-294 CEB
                                            )
CHRISTIANA CARE HEALTH                      )
SERVICES, INC., NEUROSURGERY                )
CONSULTANTS, P.A. and BIKASH                )
BOSE, M.D.,                                 )
                                            )
                Defendants.                 )

Submitted: November 2, 2020
Decided: February 22, 2020

## MEMORANDUM OPINION

*Plaintiff's Motion to Compel Discovery*
**GRANTED IN PART, DENIED IN PART.**

Timothy E. Lengkeek, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware. Attorney for Plaintiff.

Richard Galperin, Esquire, Joshua Meyeroff, Esquire, Ryan T. Keating, Esquire, Phillip M. Casale, Esquire, MORRIS JAMES LLP, Wilmington, Delaware. Attorneys for Defendant CCHS.

Dawn C. Doherty, Esquire, Michael F. Duggan, Esquire, Joseph E. Brenner, Esquire, MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Wilmington, Delaware. Attorneys for Defendants, Neurosurgery Consultants, P.A. and Bikash Bose, M.D.

**BUTLER, R.J.**

This matter is before the Court on a motion to compel discovery responses. To answer the questions raised, the Court must consider the medical peer review privilege in the context of a medical negligence lawsuit.

## FACTS AND PROCEDURAL HISTORY

According to the Complaint,[1] Plaintiff is the surviving spouse of Vance Palmer. It is alleged that Mr. Palmer had an MRI of his brain in 2016, revealing a meningioma. A second MRI about five months later showed a stable meningioma of smaller size than the first MRI. It is alleged that Dr. Bose announced that the second MRI showed growth over the first MRI. He performed surgery on Palmer's brain. During the surgery, Palmer suffered a stroke. The Complaint alleges that the surgery was not necessary, lacked informed consent, and was negligently performed. Approximately a year later, it is alleged that Palmer died from the stroke.

As to defendant Christiana Care Health Services, Inc. ("CCHS"), there are allegations of *respondeat superior*, agency, supervision and failure to control Dr. Bose.

The Complaint further alleges that CCHS was aware of Dr. Bose' propensity to commit negligent surgeries. It is alleged that at the time of the Palmer surgery, Bose had been named as a defendant in thirty-one medical negligence lawsuits and

---

[1] The Complaint was amended in a non-significant detail and for ease of reference, we will refer to the initial Complaint.

1

CCHS had been named as a co-defendant in fifteen of them. It is alleged that CCHS never took any action to limit Dr. Bose's credentials or recommended any corrective action as to Dr. Bose.

According to the Complaint, CCHS recredentialed Dr. Bose in 2014 despite its notice of Bose's prior incidents of negligence. CCHS is thus named as a defendant both in its role as a supervisor and controller of Dr. Bose and as overseer of the credentialling of doctors who practice at CCHS.

Contemporaneous with the filing of the Complaint, Plaintiff served interrogatories and document production requests on all defendants. In this first pleading by Plaintiff, many of the interrogatories sought information about any peer review meetings held concerning Dr. Bose and multiple pieces of information surrounding the creation, membership, meeting dates and results of any such peer review meetings. CCHS declined to respond to many of these requests, citing peer review privilege. Finally, Plaintiff's requests do not differentiate between which peer review committees, whether they relate to the surgery itself or the credentialling of Dr. Bose. The requests appear very much of the "boiler plate" variety. Plaintiff moved to compel answers to fifteen of the interrogatories and four document

requests Plaintiff served with the Complaint. These claims of privilege are the heart of the issue now before the Court.[2]

## ANALYSIS

### A. The Peer Review Statute

Our frame of reference begins with the medical peer review statue, 24 *Del. C.* § 1768. Section (a) gives the members of any group "whose function is the review of medical records, medical care, and physicians' work, with a view to the quality of care and utilization of hospital or nursing home facilities" immunity from liability for any acts done or not done, "or from any recommendation made, so long as the person acted in good faith and without gross or wanton negligence."[3] Section (b)

---

[2] At argument on the motion to compel, the Court and the parties engaged in a lengthy discussion of the medical peer review privilege and its impact on claims of negligent credentialling. Indeed, some cases have questioned the viability of negligent credentialling in light of the peer review privilege. *See, e.g., Riggs Nat. Bank v. Boyd,* 2000 WL 303308, at *2 (Del. Super. Ct. Feb. 23, 2000); *Robinson v. LeRoy,* 1984 WL 14129, at *1 (D. Del. Nov. 16, 1984); *Svindland v. A.I. Dupont Hosp. for Children of Nemours Found.,* 2006 WL 3209953, at *2 (E.D. Pa. Nov. 3, 2006). The Court invited CCHS to move for partial summary judgment on the issue generally if it felt so inclined and the parties ultimately briefed that question. Upon further review, however, it is clear that the issue is not well framed at this point in the litigation. The pleadings do not separately state a claim of negligent credentialling (as opposed to negligent supervision) and no expert testimony has been proffered on the issue of appropriate credentialling. Because the Court can resolve the immediate issue of discovery without reaching the broader question raised in oral argument, it will defer grappling with that question for now, as the immediate discovery dispute has given the Court plenty of opportunity to discuss the state of peer review law independent of the summary judgment arguments, interesting though they may be.

[3] 24 *Del. C.* §1768(a).

3

goes further and protects any "records and proceedings" of any such organization from disclosure and grants any witness at a peer review meeting the privilege to refuse to testify about the proceedings in peer review.[4]

The peer review statute was enacted in 1976 as part of a comprehensive revision of the laws governing the practice of medicine.[5] The Supreme Court has said that "Delaware courts have recognized that the public policy behind the peer review privilege is to foster open and critical inspection of health care facilities procedures."[6]

**B. Peer Review Outside Medical Negligence**

*Connolly v. Labowitz*, decided in 1984, was an epic battle between two Delaware doctors alleging defamation and included claims, counterclaims and fierce discovery battles.[7] One of Connolly's claims was that Labowitz had defamed him to the county Medical Practices Board. Connolly sought the records of the Board, a peer review committee within the meaning of the privilege statute.

In its ruling on Connolly's discovery motion, the Court said:

> Privileges are repugnant to the adversarial judicial system in the United States and are therefore narrowly construed. The need to develop

---

[4] 24 *Del. C.* §1768(b).
[5] Delaware Medical Practices Act, 60 Del. Laws ch. 462 (1976).
[6] *Office of Chief Med. Exam'r v. Dover Behavioral Health Sys.*, 976 A.2d 160, 164 (Del. 2009).
[7] There are no less than 12 published opinions denominated *Connolly v. Labowitz*, covering everything from the peer review privilege to the First Amendment and the discovery of tax returns.

relevant facts is fundamental in an adversarial system. The integrity of our system relies on full disclosure of all relevant facts with the framework of the Rules of Evidence. The public has the right to every man's evidence except for persons protected by privilege. [T]hese exceptions are not lightly created nor expansively construed for they are in derogation of the search for truth.[8]

Because of the issues relevant in *Connolly*, a narrow reading of the peer review statute was probably appropriate. In order to allow discovery responsive to the issues in dispute and to protect the peer review privilege, the Court held that the privilege is limited to 1) records, meaning "any paperwork, reports or compilation of data which are used *exclusively* by the committee,"[9] 2) documents created by the committee that were not shared with non-members, i.e., sharing a document with a non-member waived the privilege, and 3) the actual testimony of witnesses appearing before the committee.[10] But these restrictions left other information available to be discovered:

> "[t]he identity of who testified, when the committee met, and other similar nontestimonial information is discoverable. To hold otherwise would insulate the proceedings from investigation and prevent even an action based on malice or bad faith of the committee, a result that is contrary to the plain meaning of the statute."[11]

---

[8] *Connolly v. Labowitz,* 1984 WL 14132, at *1 (Del. Super. Dec. 17, 1984) (internal citations omitted).
[9] *Id.* (emphasis added).
[10] *Id.* at *2.
[11] *Id.*

5

It does not appear that any cases since *Connolly* has questioned why the peer review proceeding should *not* be insulated from investigation or exactly what sort of investigation the Court felt it should not be insulated from, since the statute is designed to do exactly that – insulate the peer review committee from investigation.

*Connolly* is often cited in medical negligence disputes, but it was not a medical negligence case at all. It was a discovery dispute in a defamation action. But *Connolly's* holding that the peer review privilege was waived as to anything it communicated outside the confines of the committee itself is problematic. Peer review committees, and the hospitals that employ them and the lawyers that represent them, must thus be ever vigilant that they maintain confidentiality of communications lest the committee be charged with waiver and loss of the privilege.

*Dworkin v. St. Francis Hospital*[12] was another ruling on a motion to compel information arguably protected by the peer review statute. Dworkin was a doctor who sued St. Francis over a limitation on his privileges, which he claimed was a result of incorrect information before the credentials committee. As against St. Francis' claim of privilege, the Court said the peer review privilege does not insulate the committee's decisions from scrutiny, as scrutiny is "necessary to ensure that the committees act in accordance with their powers and in a manner consistent with principles of fairness. Inquiries dealing with the existence of an investigation, the

---

[12] 517 A.2d 302, 304-07 (Del. Super. 1986).

steps taken to generate evidence from which to render a decision, and the evidence on which such decisions are based provide information that is essential toward this end."[13]

The Court's ruling that a civil litigant may inquire into the existence of an investigation, the steps taken to generate evidence and the evidence relied on in making the committee's decision may have gotten the *Dworkin* Court to the issue before it, but recall that the peer committee in question was a credentials committee. The *Dworkin* logic applied to a committee investigating a bad surgical outcome would find itself all but stripped of its privilege protection.[14] Thus, in analyzing discovery issues where medical peer review privilege is claimed, it is important to consider the claims being litigated and the purposes for which the discovery is sought.

---

[13] *Dworkin v. St. Francis Hosp., Inc.,* 517 A.2d 302, 307 (Del. Super. 1986).

[14] *See also Lipson v. Anesthesia Serv.'s, P.A.,* 790 A.2d 1261, 1276-77 (Del. Super. 2001) ("The Act provides no protection for members of a medical practice (or other health care entity) who take steps to discipline a rogue care provider outside of a clearly defined peer review process, even if the ultimate goals of such action are the enforcement of professional standards and patient safety."); *Sweede v. Cigna Healthplan of Delaware, Inc.,* 1989 WL 5194, at *2 (Del. Super. Jan. 12, 1989) (holding documents are not privileged when created for a Quality Assurance Program but include the review committee's procedures and evidence considered during review because the documents fall outside the scope of 24 *Del. C.* § 1768).

## C. Peer Review of "Bad Outcomes"

Drawing from sources somewhat closer to this case, *French v. Medical Center of Delaware*[15] was a medical negligence action. The plaintiff's daughter had injured herself while in the defendant's care and the medical center undertook an investigation into the incident, asking witnesses to record in writing what they saw shortly thereafter. When suit was filed and plaintiff sought copies of the witness statements, the hospital sought peer review privilege protection from discovery of the statements. Responding to this argument the Court said this:

> In one sense, the hospital's argument is correct: the [peer review] statute is drafted in a way that one can extract words from it and paste them back together to suggest the language of the statute protects the statements of the staff members. In that sense the statements are "records" of an "organization" "whose function is the review of medical care" "with a view to the quality of care." Of course, that cut and paste work could lead others to conclude that the statute would make almost every piece of paper in a hospital privileged, as almost every paper, from the warranty and disclosure papers that come with a medication to the bill for flowers for a patient, are "records" of an "organization" "whose function is the review of medical care" "with a view to the quality of care.[16]

In the *French* Court's view, statements prepared by witnesses after an event that record what they heard and saw are not the "type of records" intended to be protected by the peer review statute. Rather, "the statute is directed at protecting the exchange of ideas, criticisms, and comments that the members of

---

[15] 1993 WL 13646184, at *1 (D. Del. Oct. 6, 1993).
[16] *Id.* at *6.

8

a review committee need to feel free to contribute in order to ensure that the committee's analysis is candid and rigorous and can assist the medical community in reviewing and improving the quality of its services."

The *French* case illustrates a concern one must have in parsing the scope of the privilege in a medical negligence case. On one hand, the medical profession needs the space to learn from bad outcomes and get better; on the other hand, the hospital's investigation may yield information that could lead to a large damage award against itself, an obvious disincentive to any self-analysis.[17] Whether a robust peer review privilege is good or bad depends, as they say, on where one sits.

Many hospitals operate an "M&M Conference" or similar quality assurance committee to discuss cases of morbidity, mortality or other unfortunate outcomes occurring within the hospital with a view to improving the quality of care.[18] Those peer review committee discussions represent the core of what a peer review privilege must protect, for without the immunity of the peer review privilege, it is doubtful the peer review of such cases would happen at all. When civil litigants seek information

---

[17] Ironically, there have been cases under the peer review statute in which the hospital defendant has actively sought the Court's ruling that the privilege may be waived so that the hospital defendant could demonstrate its good faith and adherence to professional standards of care. *See, e.g, Riggs Nat'l Bank*, 2000 WL 303308, at *8. Thus it may be true that the hospital is not simply trying to hide information; it may feel itself bound by the statute to refuse disclosure lest it violate the statute or set a precedent that could haunt it in another case later on.

[18] *See generally Morbidity and Mortality Conference*, WIKIPEDIA (Jun. 13, 2020, 11:44 PM), https://en.wikipedia.org/wiki/Morbidity_and_mortality_conference.

pertinent to an "M&M conference," they are knocking on the door of the most sensitive discussions in the medical profession.

Credentialing Committees stand in a different place from an M&M conference. Delaware Courts have routinely found that a Credentials Committee is a "peer review committee" and may invoke the protections of the statutory privilege.[19] Credentialing involves "the review of medical records, medical care, and physicians' work," but an inquiry into credentialling is less likely to probe the details of a single bad surgical outcome. A Credentials Committee may have to ask and answer questions about less than positive information about the physician seeking privileges or an extension of existing privileges. But in the zone of sensitive information the statute was intended to protect, credentialling a doctor to practice at a hospital is more in the nature of a personnel decision than an examination of what went wrong in a bad outcome case that has become the subject of litigation.

What is not present in the cases is a sensitivity to the type of committee being queried or the type of information being sought. An employment dispute over credentials is a different animal from a medical negligence dispute over patient care.

---

[19] *Riggs Nat'l Bank*, 2000 WL 303308, at *1 ("It is hard to suggest that credentialing committees of hospitals do not come within the statute."); *See also Armstrong v. A.I. DuPont Hosp. for Children*; 60 A.3d 414, 422 (Del. Super. 2012) ("[T]he plaintiffs needed to get to Beebe's peer review and credentialing committee records to assist their case but such records are and were statutorily privileged and inaccessible to plaintiffs." (citing *Riggs Nat'l Bank*, 2000 WL 303308, at *5))); *Cain v. Villare*, 2005 WL 2710854, at *2 (Del. Super. Oct. 19, 2005).

They may both invoke peer review privilege, but the core of what the statute seeks to protect is implicated in different ways in each case.

This case is an example. Plaintiff's discovery demands were filed contemporaneously with the filing of the Complaint. They are in the nature of "boilerplate" requests and make no distinction from what peer review committee they seek information. The point is not that they are therefore defective. Rather, they suggest that a medical negligence plaintiff believes this to be a legitimate starting point for discovery in any medical negligence lawsuit.

The Court disagrees. Peer review committee work should not be the commencement point for discovery. To the extent the discovery seeks information pertaining to a peer reviewed "M&M" or similar conference concerning the outcome in this case, that committee work and all of its circumstances deserve a wide berth by statute and, frankly, by common sense.

**D. The Peer Review Privilege for the CCHS Credentials Committee**

Credentialing and the Credentials Committee is less likely to implicate the core values expressed in the statute. Certainly, to the extent these confidences are expressed in the committee's work, the statute requires that they remain protected.

Plaintiff's Complaint details that despite thirty-one lawsuits, fifteen of which specifically named CCHS as a co-defendant, CCHS did nothing to limit or terminate Dr. Bose's credentials or relationship with CCHS. To the Court, that sounds like a

11

lot of lawsuits for one doctor. But this judge's sense that it "sounds like a lot" is a poor substitute for record evidence. Dr. Bose is a neurosurgeon, the record has no reference to a reasonable number of lawsuits for a neurosurgeon, over what period of time and for what sorts of complaints.

A review of the cases suggests that discovery motions over peer review usually appear after the parties have engaged in discovery and the Court is far better informed by the pleadings than this one is.[20] The interrogatories here, for example, seek the same information for *any* peer meeting "regarding Dr. Bose." The Court has here delineated its view that the scope of peer review discovery depends on the peer committee being queried and the claim upon which discovery is sought.

To the extent CCHS conducted a peer review consideration of the outcome of this surgery, the Court will not permit discovery of its content as such a peer committee review is the essence of the peer review privilege.

To the extent Plaintiff seeks information concerning the credentialing of Dr. Bose by CCHS, the Court is not convinced by the bare pleadings that Plaintiff has made out a case of bad faith or gross or wanton negligence; further discovery may flesh out such an argument. But the allegations are not fluff. Some discovery will be permitted of the credentials process. Hewing to *Connolly* and its progeny, the Court will permit limited discovery as follows:

---

[20] *Connolly*, 1984 WL 14132, at *7, App. A; *Dworkin*, 517 A.2d at 303.

12

(1) The dates and times of any Credentials Committee meetings at which the credentials of Dr. Bose were under consideration,

(2) Identification and production of any documents provided to but *not* produced *exclusively* for use by the Credentials Committee that were submitted to the Committee for consideration, and

(3) Any documents produced by the Credentials Committee that were shared with a different person, group or entity concerning the credentialling of Dr. Bose.

If CCHS believes that notwithstanding the Court's Order it may stand on the peer review privilege, CCHS should prepare a privilege log, identify the Credentials Committee documents withheld and be prepared to present them to the Court for *in camera* review as necessary.

## CONCLUSION

The Motion to Compel Discovery is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

Charles E. Butler, Resident Judge

13