**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| TYLER DONOVAN AND MARY DONOVAN, H/W, individually and As parents and natural guardians of M.D., a minor, | ) ) ) ) ) | |
| | ) | C. A. No. N24C-03-123 KMM |
| Plaintiffs, | ) | |
| v. | ) ) | |
| BAYHEALTH MEDICAL CENTER, INC., | ) ) ) | |
| Defendant. | ) ) | |

Date submitted: October 2, 2025
Date decided:  October 8, 2025

## DISCOVERY ORDER

*Upon plaintiffs' motion to compel: DENIED*
*Upon third-party's motion to quash: GRANTED*

**A.    *Introduction***

Plaintiffs allege that the medical providers caring for Mrs. Donovan in the early morning hours of January 26, 2023, committed medical negligence by, among other things, delaying delivery of her baby by caesarian section, which resulted in catastrophic injuries to the baby.  At heart of the pending motions are the medical records of Dr. Frederica Heller, the on-call, in-hospital physician on January 26.  The treating physician, who was not in the hospital during the relevant period, was managing Mrs. Donovan's treatment plan remotely.  Dr. Heller was called into Mrs.

Donovan's room and conducted an examination, but did not immediately begin a caesarian section.

After plaintiffs requested Dr. Heller's deposition, her personal physician advised that due to her medical condition (she suffers from Parkinson's Disease), a deposition would be detrimental to her health. Unable to depose Dr. Heller and with the disclosure of her medical condition, plaintiffs seek to obtain Dr. Heller's personal medical records, personnel file, and credentialing file.

**B.** **_Factual Background_**

Mrs. Donovan was admitted to Bayhealth Medical Center ("Bayhealth") on January 25, 2023, for a scheduled induction of labor. Mrs. Donovan's treating obstetrician, Dr. Dermo, was on-call at home at the time.[1] Treatment was rendered to facilitate delivery of the baby.

It is alleged that at 12:36 a.m. on January 26, the fetal monitoring strips showed minimal variability in the baby's heart rate.[2] Over the next hour, the heart rate allegedly flat lined. Mrs. Donovan allegedly reported that the baby had not moved since 10:00 p.m. the prior evening.

The nurse attending to Mrs. Donovan called Dr. Dermo at 1:00 a.m., although the fetal strips allegedly were not discussed. The nurse called Dr. Dermo again at

---

[1] Motion to Quash (D.I. 54), Ex. A, Dermo Tr., pp. 14-17.
[2] Plaintiffs' motion provides no record cite for their factual recitation of the events.

1:34 a.m.  According to plaintiffs, the nurse talked to Dr. Dermo only briefly, then talked to the charge nurse, and called Dr. Dermo again at 1:40 a.m. Dr. Dermo reviewed the monitoring strips from her home.[3]

Dr. Heller was the in-hospital obstetrician on January 26.[4]  She was in the on-call room when she was called into to Mrs. Donovan's room at 1:41 a.m.[5]  Dr. Heller performed a vaginal exam at 1:49 a.m.  Plaintiffs' motion asserts that Dr. Heller "basically did nothing to provide care" to the baby.  However, the record shows otherwise.

Dr. Heller arrived in the room at approximately 1:42 a.m.[6]  She introduced herself to the patient, washed her hands and put on gloves, got the patient into position for a vaginal exam, performed the exam, performed a fetal scalp stimulation, and discussed the situation and treatment plan with Mrs. Donovan, which included a discussion of a c-section.[7]

Dr. Dermo was advised of Mrs. Donovan's condition and she looked at the monitoring strips around 1:46 a.m.[8]  At that time, Dr. Dermo requested that the operating room team ("ORT") to be called into the hospital because she "called a C-section at the time, more precautionary hoping we still didn't need it, but so that

---

[3] Dermo Tr., p. 47.
[4] *Id.*, p. 17.
[5] Motion to Quash, Ex. B, Bannerman Tr., p. 48.
[6] Motion to Quash, Ex. C, Blush Tr., pp. 135.
[7] Blush Tr., pp. 141-42, 146.
[8] Dermo Tr., p. 47.

3

[she] could get things moving in case we did."[9]  The ORT is not routinely in the hospital overnight.  Dr. Dermo, while on a phone call with the nurse, asked Dr. Heller to call the ORT to the hospital.[10]  The ORT has 30 minutes to report to the hospital.[11]

Dr. Dermo arrived at Mrs. Donovan's bedside at 2:08 a.m.  When she arrived, Dr. Dermo told Mrs. Donovan that "the OR team was on their way."[12]  The baby was delivered at 2:43 a.m.  The baby suffers from significant medical conditions.

The two nurses on Mrs. Donovan's case testified that they did not believe that Dr. Heller's medical skills were compromised.[13]

## C.    *Discovery and the Subpoena*

Plaintiffs requested Dr. Heller's deposition.  In response, plaintiffs received a letter from Dr. Heller's personal physician, Dr. Rahmanian.  The letter, dated January 7, 2025, stated that Dr. Rahmanian had been treating Dr. Heller "for the past 10 years for a number of conditions including Parkinson's disease."[14]  Even though she was being treated with medication and therapy, the "condition is progressive" and she

---

[9] *Id.*
[10] *Id.*, p. 49.
[11] *Id.*
[12] Dermo Tr., p. 98.
[13] Blush Tr., p. 144 (testifying that she did not observe anything to question Dr. Heller's physical ability to perform a c-section by herself on January 26); Tr. p. 145 (Dr. Heller's "approach and conversations were appropriate at the time.  There was no indication that there was a concern for her … capabilities."); Bannerman Tr. p. 26 ("The time I've worked with Dr. Heller, I've never had any concern when I worked with her.").
[14] Motion to Compel (D. I. 50), Ex. A.

4

"has significant neurological and intellectual impairments."[15] The letter continued that "due to her Parkinson's disease which has caused an intellectual deterioration" Dr. Rahmanian was "concerned that [Dr. Heller] will not be able to process the medical/legal questions" and opined that the stress of a deposition would be detrimental to her health.

Bayhealth responded to plaintiffs' Third Request for Production of Documents on May 28, 2025. Relevant here, Request 1 asked for "A true, complete, and correct copy of Dr. Fredericka Heller's personnel file." Bayhealth objected on grounds that the request was vague and the information sought was not relevant.[16]

Request 2 asked for "A true and correct copy of any documents extending privileges, or any limitation(s) thereon, to Dr. Fredericka Heller." Bayhealth objected on the same grounds and further asserted that the information was protected by the peer review privilege. Bayhealth also stated that Dr. Heller maintained active privileges at Bayhealth in January 2023, without limitation, and that she retired in February 2023.

With no prior communication regarding any alleged deficiencies in Bayhealth's discovery response nor a request for a meet and confer, plaintiffs contacted defense counsel on September 11 requesting consent to increase the page

---

[15] *Id.*
[16] Response to Motion to Compel (D.I. 52), Ex. B.

limitation on their upcoming motion to compel.[17]  Defense counsel asked for a meet and confer, which was held the next day.  During the meet and confer, Bayhealth first learned that plaintiffs were seeking all documents responsive to their requests.[18]  Bayhealth's counsel requested two weeks to discuss plaintiffs' renewed requests with his client before a motion to compel was filed.  Plaintiffs refused the request, citing the deadlines in the Case Scheduling Order.

On September 15, plaintiffs issued a subpoena to Dr. Rahmanian, seeking Dr. Heller's entire medical file for the period January 1, 2017 to May 1, 2023.[19]  The Motion to Compel was filed on September 17.  The Court heard argument on October 2, 2025.

### D.    *The Motions*

Plaintiffs filed a Motion to Compel Defendant's Production of Documents and Order Third Party Subpoena for Medical Records of Fredericka Heller, M.D.[20] ("Motion to Compel"), seeking an order compelling Bayhealth and/or Dr. Heller (through her personal counsel) to produce her medical records from January 1, 2017 through May 1, 2023 (the "Medical Records") or in the alternative, permit plaintiffs

---

[17] *Id.*, Ex. C.

[18] Dr. Heller obtained privileges at Bayhealth in 2013.  There was no time limitation on the Requests.

[19] At the hearing, counsel reported that the subpoena was served on Dr. Rahmanian.  The Court issued an oral order that the subpoena is stayed and Dr. Rahmanian has no obligation to respond until the Motion to Quash is decided.

[20] D.I. 50.

to obtain these records through the subpoena. The Motion to Compel contains an approximately eight-page factual recitation, with no record citations. Plaintiffs assert that the Medical Records must be produced to "assess the credibility of [Dr. Rahmanian's] assertions and whether Defendant Bayhealth was further negligent with regard to the treatment of this child is [*sic*] to see what the physical and mental status was of Dr. Heller in the January 2023 timeframe and the months before that date."[21] The Motion to Compel cites no legal authority in support of the arguments.

Bayhealth responds that on Request 1, Dr. Heller was not an employee and therefore, it did not maintain a personnel file on Dr. Heller. Thus, there is nothing to produce. On Request 2, Bayhealth asserts that the credentialing file is protected by the peer review privilege under 24 *Del. C.* § 1768, and plaintiffs have not shown willful or wanton misconduct to fall within the exception to the privilege.

Dr. Heller's personal attorney filed the Motion to Quash Subpoena ("Motion to Quash"),[22] in which she asserts that the information sought by the subpoena is protected under HIPAA laws and Delaware's corresponding privacy law. Dr. Heller argues that plaintiffs are attempting to embark on a fishing expedition, based on nothing more than a generalized statement that "Dr. Heller was presumably not capable of providing such medical care."[23] Dr. Heller provides a detailed timeline,

---

[21] *Id.*, ¶ 18.
[22] D.I. 54.
[23] D.I. 50, ¶ 4.

supported by deposition testimony, which shows that she was engaged with the patient from 1:42 a.m. to 1:49 a.m. and that Dr. Dermo gave Dr. Heller instructions to prepare the OR. Dr. Heller further argues that because the ORT was not at the hospital during the approximate 7-minute period she was involved in Mrs. Donovan's care, a c-section could not have been performed "immediately" as plaintiffs claim. So even if Dr. Heller had been mentally or physically compromised, no physician could have performed a c-section at that time and therefore, Dr. Heller's private medical records are not relevant.

Plaintiffs respond to the Motion to Quash by incorporating their arguments from the Motion to Compel. Plaintiffs claim that Dr. Heller "did nothing except 'prepare' the operating room for cesarean delivery" and, with no factual support, that "Dr. Dermo did not trust Dr. Heller to deliver this child."[24] Responding to the assertion that no physician could have performed the cesarean delivery because the ORT was not onsite, plaintiffs claim there is no factual support for this statement and further, if that were the case, it would be another deviation in the standard of care.[25] To address Dr. Heller's privacy concerns, plaintiffs agreed to keep the records confidential.

---

[24] D.I. 55, ¶¶ 4-5.
[25] *Id.*, ¶ 8.

**E.     *Standard of Review***

Pursuant to Superior Court Civil Rule 26(b)(1), "Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, .… It is not ground for objection that the information sought will be inadmissible at the trial."  Rule 26(c) grants courts discretion to issue protective orders to shield parties or non-parties from "annoyance, embarrassment, oppression, or undue burden or expense."  Protective orders may limit the scope of discovery, specify terms and conditions, or restrict access to sensitive information.

Superior Court Civil Rule 45(c)(3)(A) provide that "[o]n timely motion, the Court shall quash or modify the subpoena if it . . . (ii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or (iii) subjects a person to undue burden."

**F.     *Discussion***

**1.     *Meet and Confer***

Superior Court Civil Rule 37(e)(1) provides that no motion shall be filed "unless such motion shall include a certification by the moving party detailing the dates, time spent, and method of communication in attempting to reach agreement

on the subject of the motion with the other party or parties and the results, if any, of such communication ….” The Motion to Compel contains no certification.[26]

Defense counsel had no notice of plaintiffs' claim of discovery deficiencies when plaintiffs' counsel requested consent to a procedural matter. Thus, defense counsel first learned of plaintiffs' position during the meet and confer. Plaintiffs' counsel refused defense counsel's reasonable request for two weeks to get back to them on the topics discussed during the meeting. At the hearing, plaintiffs attempted to explain away this failure. They asserted that they could not file the Motion to Compel or follow up on Bayhealth's discovery responses until other depositions were completed, which occurred in August. They further asserted that because their expert reports were due in early 2026 and it is difficult to get experts to produce reports timely, plaintiffs had to file the motion to allow time for the discovery dispute to playout. Plaintiffs told Bayhealth's counsel that if the matter was resolved, they would simply withdraw the motion.

Meet and confers are not a check-the-box requirement. Parties are expected to engage in meaningful attempts to resolve disputes. Refusing Bayhealth's counsel time to discuss plaintiffs' position with his client before the motion was filed is indicative of the meet and confer being a going-through-the-motions exercise. That

---

[26] The motion should have been rejected for failure to include the certification. It was not, so the Court will not consider the lack of certification in its ruling.

10

plaintiffs' expert reports are due on *February 27, 2026*, is not justification to refuse a reasonable request when attempting to resolve discovery disputes. Plaintiffs' inability to get their expert to timely provide a report is no basis to violate the requirements of the rule. The meet and confer process was clearly deficient and falls below the Court's expectations. The Motion to Compel should be denied on this basis alone. But, in order to spare Bayhealth and Dr. Heller the expense of a subsequent motion, the Court will address the merits.

2. *Motion to Compel*

Request 1 seeks "A true, complete, and correct copy of Dr. Fredericka Heller's personnel file." Bayhealth has represented that Dr. Heller was not an employee and did not maintain a personnel file on Dr. Heller. When plaintiffs' counsel was pressed multiple times by the Court at the hearing on what exactly he wanted the Court to order in light of Bayhealth's representation, counsel said he wanted the contents of the credentialing file. The Court construes this non-response as an abandonment of Request 1. The Court also accepts Bayhealth's representation. The Motion to Compel with respect to Request 1 is **DENIED**.

Request 2 seeks "A true and correct copy of any documents extending privileges, or any limitation(s) thereon, to Dr. Fredericka Heller." Bayhealth asserts that this request is improper because peer review files are privileged.

11

Under Section 1768(a), members of peer review committees, whose function it is to review physician's work with a view to the quality of care, "are immune from claim, suit, liability, damages … so long as the person acted in good faith and without gross or wanton negligence in carrying out the responsibilities … conferred by law upon them, with good faith being presumed until proven otherwise, and gross or wanton negligence required to be shown by the complainant."[27] The records of such committees are confidential and "are not available for court subpoena, nor are they subject to discovery."[28] The public policy of the peer review statute "is to foster open and critical inspection of health care facilities procedures"[29] and therefore, "the members of a review committee need to feel free to contribute in order to ensure that the committee's analysis is candid and rigorous and can assist the medical community in reviewing and improving the quality of its services."[30] Credentialing committees are peer review committees, and thus protected by the statute.[31]

---

[27] 24 *Del. C.* § 1768(a).
[28] 24 *Del. C.* § 1768(b).
[29] *Palmer v. Christana Care Health Services, Inc.*, 2021 WL 673462, at *2 (Del. Super. Feb. 22, 2021) quoting *Office of Chief Med. Exam'r v. Dover Behavioral Health Sys.,* 976 A.2d 160, 164 (Del. 2009).
[30] *Palmer*, 2021 WL 673462, at *2 quoting *French v. Med. Ctr. of Del.,* 1993 WL 13646184, at *1 (D. Del. Oct. 6, 1993).
[31] *Palmer*, 2021 WL 673462, at *4.

To overcome the privilege, a plaintiff must plead/show gross or wanton negligence with particularity.[32] "[C]laims of negligence (and gross negligence) may not be conclusory and must be accompanied by some factual allegations to support them."

Here, there is no dispute that the peer review privilege applies to the credentialing file. While the Motion to Compel is full of colorful descriptions of the events of January 25th and 26th, it makes no effort to show that the exception to the privilege applies. In fact, the Motion to Compel fails to even mention the privilege.[33]

At the hearing, plaintiffs claimed that they sufficiently pled gross negligence in paragraph 53 of the complaint. That paragraph contains a series of conclusory allegations that Bayhealth was "negligent, reckless, willful and wanton" by failing to select and retain qualified and competent healthcare providers, failing to train and supervise healthcare providers, and failing to adopt policies to ensure its healthcare providers rendered services within the standard of care. Nowhere in paragraph 53, or the complaint generally, are there any particularized facts of gross or wanton

---

[32] *Jane DOE 30's Mother v. Bradley*, 58 A.3d 429, 462-63 (Del. Super. 2012) ("Gross negligence is defined as a higher level of negligence representing an extreme departure from the ordinary standard of care.") (citation omitted); Super. Ct. Civ. R. 9(b).

[33] Plaintiffs were on notice that Bayhealth was relying on the peer review privilege, yet they failed to address it in the Motion to Compel. Thus, plaintiffs waived the argument that the privilege does not apply. However, the Court will address the argument raised for the first time at the hearing.

negligence relating to Bayhealth's credentialing committee or Dr. Heller. The Motion to Compel with respect to Request 2 is **DENIED**.[34]

### 3. *Motion to Quash*

Plaintiffs' response to the Motion to Quash, which incorporates the Motion to Compel, spends much time complaining about what others did or did not do in the early morning hours of January 26. Plaintiffs take issue with the communications (or lack thereof) between the nurse and Dr. Dermo, criticize the decision not to call Dr. Heller until 1:41 a.m., claim that Dr. Dermo was "extremely inexperienced" and was "paralyzed with inactivity," and blame Dr. Dermo for not telling Dr. Heller to "start the c-section immediately." Plaintiffs say very little about Dr. Heller, and what they do say is mostly conclusory. Plaintiffs assert that Dr. Heller did nothing more than "prepare" the OR for the surgery. The record, however, shows that after Dr. Heller was called to Mrs. Donovan's room, Dr. Heller talked with Mrs. Donovan before preforming the examination at 1:49 a.m.

The crux of plaintiffs' argument is that it took Dr. Heller seven minutes to perform the vaginal exam and that she did not immediately start the c-section.

Plaintiffs are incorrect when they assert that there is no factual support for the statement that the ORT was not onsite when Dr. Heller was attending to Mrs.

---

[34] Additionally, Bayhealth represented that it is not in possession of Dr. Heller's medical records. Again, Bayhealth cannot produce what it does not possess.

14

Donovan. Dr. Dermo testified that the ORT had to be called because they were not in the hospital at the time.[35] The team had 30 minutes to arrive.[36] At 2:08 a.m., Dr. Dermo told Mrs. Donovan that the ORT was "on the way." Plaintiffs ignore this evidence. The record shows that Dr. Heller could not have performed an immediate c-section because the ORT was not onsite.

Plaintiffs' remaining basis for obtaining Dr. Heller's Medical Records is that it took seven minutes before she performed an exam, she suffered from Parkinson's Disease since 2015, and she now cannot be deposed. The Court takes judicial notice that Parkinson's Disease is a progressive condition. That Dr. Heller cannot be deposed two years after the events is no indication that her competency was compromised in January 2023. Similarly, plaintiffs' bald assertion that it should not have taken Dr. Heller seven minutes to conduct the exam is not an indication that her competency was compromised. Plaintiffs "presuming" Dr. Heller was compromised on January 26, 2023 does not justify intrusion into her personal medical records.

---

[35] Dermo Tr., pp. 49, 77-78, 98.
[36] *Id.*

The Court finds that Dr. Heller's medical records are not relevant. The Motion to Quash is **GRANTED**.

**IT IS SO ORDERED**.

*/s/Kathleen M. Miller*
Kathleen M. Miller, Judge

16